Frederic L. Gordon, Esq. (SBN 98994)
P.O. Box 60761
San Diego, CA. 92106
Tel: 619-572-2210
Email: FGordonAPC@gmail.com


Attorneys for PLAINTIFFS


# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINCENT GRANO, an individual,<br><br>                                    Plaintiff,<br><br>                          v.<br><br>SODEXO MANAGEMENT, INC., a New York Corporation; and CARGILL MEAT SOLUTIONS CORP., a Delaware Corporation,<br><br>                                    Defendants.<br><br><br>AND RELATED CASES | Case No.: 3:18-cv-01818-TRW BLM<br>Case No.: 3:19-cv-01903-TRW-BLM<br>Case No.: 3:19-cv-01904-TRW-BLM<br>Case No.: 3:19-cv-01905-TRW-BLM<br>Case No.: 3:19-cv-01907-TRW-BLM<br>Case No.: 3:19-cv 01908-TRW-BLM<br>Case No.: 3:19-cv-01917-TRW-BLM<br><br>**PLAINTIFFS' OPPOSITION TO CARGILL'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF SCOTT STILLWELL, PH.D.** |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ………………………………………………….......iii

LIST OF EXHIBITS…………………………………………………………………iv

I.      INTRODUCTION ……………………………………………………………1

II.     STATEMENT OF OPERATIVE FACTS ……………………………………1

III.    ARGUMENT …………………………………………………….……10

      A.      What Cargil deems "unreliable methodology" is deperation to keep out of evidence Scott Stillwell's far more rigorous approach to keeping STEC out of ground beef……………………………………………………………11

      B.      Cargill misunderstands Scott Stillwell's opinion that there is a 95% certainty that Cargill produced and distributed contaminated ground beef…………………………………………………………………..21

      C.      Cargill has not demonstrated that Stillwelll lacked sufficient data to form conclusions on the issues described at IV.B.3 of its brief………………………22

      D.      Cargill's remedy for any of Stillwell's opinions for which he alludes to his experience at Tyson is cross-examination and the presentation of contrary evidence……………………………………………………...…………………23

      E.       The FSIS communications…………………………………………………..24

IV.    CONCLUSION …………………………………………………….…………25

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

*Eisenbise v. Crown Equip. Corp.*, 260 F. Supp. 3d 1250 (S.D. Cal. 2017) .............................. 11

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995).................................................... 11

### <u>Rules</u>

Fed. R. Evid. 702

### <u>Regulations</u>

9 CFR 417.2............................................................................................................................. 6

9 CFR 417.5........................................................................................................................4, 5, 6

### <u>Other Authorities</u>

Foundation for Meat & Poultry Research & Education, "Microbiological Testing,"
    https://www.meatpoultryfoundation.org/fact-sheets/microbiological-testing (September 17,
    2021)..................................................................................................................................... 9

FSIS Directive 10,010............................................................................................................. 17

FSIS Directive 5000.6.........................................................................................................18, 21

FSIS Notice 65-07.................................................................................................................... 14

Meat + Poultry, "War of Numbers,"  https://www.meatpoultry.com/articles/19121-war-of-
    numbers (September 17, 2021). ......................................................................................... 15

USDA, "askFSIS Public Q&A: Processing Establishment's need for a CCP for Raw Beef
    Fabrication," https://ask.usda.gov/s/article/Does-Food-Safety-Inspection-Service-mandate-
    that-an-official-processing-establishment (September 17, 2021). ....................................... 14

# LIST OF EXHIBITS

Exhibit No.　　A　　FSIS Notice of Intended Enforcement (NOIE) dated December 2007

Exhibit No.　　B　　FSIS Notice of Deferral dated February 19, 2008

Exhibit No.　　C　　Deposition Excerpts of Cari Dufner dated May 17, 2021

Exhibit No.　　D　　Deposition Excerpts from Angie Siemens dated May 19, 2021

Exhibit No.　　E　　Deposition Excerpts from Kelly Vest dated June 15, 2021

Exhibit No.　　F　　Q&A section of FSIS Directive 10,010

Exhibit No.　　G　　Compliance Guideline HACCP Systems Validation April 2015

Exhibit No.　　H　　Cargill's Responses to Plaintiffs' 11th Requests for Production

Exhibit No.　　I　　Global Beef Supplier Approval Program, redacted (**Redacted, submitted under seal**)

Exhibit No.　　J　　Supplier Complaint Notifications, redacted (**Redacted, submitted under seal**)

Exhibit No.　　K　　Report of Scott Stillwell, PhD

Exhibit No.　　L　　Affidavit of Scott Stillwell, PhD

Exhibit No.　　M　　Deposition Excerpts of Scott Stillwell, PhD dated May 25, 2021

Exhibit No.　　N　　FSIS Notification 65-07

Exhibit No.　　O　　FSIS Communications

Exhibit No.　　P　　Presentation of Angie Siemens

Exhibit No.　　Q　　FSIS Directive 5000.6

Exhibit No.　　R　　PAA Studies, redacted (**Redacted, submitted under seal**)

Exhibit No.　　S　　Deposition Excerpts of Mindy Brashears dated June 18, 2021

COME NOW PLAINTIFFS, and oppose defendant Cargill Meat Solutions Corp.'s motion to exclude the opinions and testimony of Scott Stillwell Ph.D.

## I.     INTRODUCTION

Cargill wants Scott Stillwell excluded because he articulates standards of conduct that Cargill knows it hasn't ever met. Stillwell stands for action over words, an unrelenting desire to improve performance, and science and data-driven decisions and analysis. As articulated through the words and actions of its food safety chief, Angie Siemens, Cargill does not. Indeed, Scott Stillwell and Tyson are the antithesis of Angie Siemens and Cargill, and there is no objective set of data showing otherwise.

Plaintiffs believe the following to be a fair summary of Cargill's attack: Stillwell is not smart enough; he favors using actual data to assess STEC performance, where Cargill prefers that its STEC performance not be judged; and Stillwell is just a "chicken guy."

Plaintiffs will set the record straight on these issues, but will also, for the Court's assistance in understanding the motivations for Cargill's attack on Stillwell, continue their explanation of the system that Cargill engineered for itself to avoid the negative consequences of real data. It is a system conceived in the wake of Cargill's 2007 outbreak to make bad data go away, to make effective oversight of trim suppliers discretionary, and to insulate itself from having to make wholesale changes to the way it produces ground beef. Indeed, it is only by understanding the system that Cargill engineered for itself that the Court can comprehend why it is that Scott Stillwell must testify. If he does not, Cargill will succeed in its effort to be held to no standard whatsoever.

## II.   STATEMENT OF OPERATIVE FACTS

On August 16, 2007, at its establishment in Butler, Wisconsin, Cargill produced frozen ground beef patties that were contaminated by *E. coli* O157:H7. As alleged in Plaintiffs' 4th Amended Complaints (ECF. 312 at ¶46), in response to the outbreak FSIS issued a Notice of Intended Enforcement, **Exhibit A** to Declaration of R. Drew Falkenstein  (Plaintiffs 000711-720)[1]. The NOIE stated, among other things, that "Your company's HACCP Reassessment Notes written response to the E. coli O157:H7 positive on finished ground beef product was the same for all four E. coli O157:H7 positive finish ground beef products." *Id.* at 3. Thus, before the 2007 outbreak, and before Cargill engineered for itself a new system in which it did not have to react to bad data, Cargill was reassessing its HACCP plan after STEC-positive finished product test results.

In response to the NOIE, Cargill undertook revisions to its food safety program at the Butler facility. Among other things, (a) Cargill began to test samples from all finished ground beef production lots for the presence of STEC; and (b) heavily revised its trim supplier requirements program. The list of changes is detailed at Notice of Deferral, **Exhibit B** (Plaintiffs 000748-754).

The Notice of Deferral also describes Cargill's commitment to continuing its practice of reassessing its HACCP plan after finished product positives. It states:

> In addition, your establishment will perform a reassessment to determine whether the newly identified deviation, or other unforeseen hazard, should be incorporated into the HACCP plan, as required by 9 CFR 417.3(b) and 417.5(a)(3); *specifically when positive E. coli O157:H7 results are detected in finished product as a result of customer specific sampling requirements or finished product on-going verification testing.* (*Id.* at 000750-751) (emphasis added).

---

[1] All additional exhibit references are attachments to the Falkenstein Declaration.

With regard to its trim supplier requirements, Cargill committed to undertaking an intensive review any time a supplier's trim was utilized in grinding finished product that tested positive for STEC. The Notice of Deferral states:

> If a pattern develops implicating a specific supplier, or if raw material from the same supplier is implicated in positive product a second time within 120 days, the supplier will be notified and a complete review of that supplier(s) documentation will be completed. A complete review will require one of your company's employees or a third party designee to audit the supplier's E. coli O157:H7 control program. Corrective actions by the supplier will be required, if warranted, following the review or with a final action to disqualify the supplier (*Id*. at 000752).

In the years that followed, Cargill whittled away at its new food safety program. The end-result of the systemic, self-prescribed erosion of its program was the system in place in 2017 that insulated it from the results of its own data, and rendered meaningless some of the positive changes to trim supplier requirements implemented after the 2007 outbreak. The following are examples:

A.  Despite the assurances Cargill apparently gave to FSIS that are described in the Notice of Deferral, Cargill ceased reassessing its HACCP plan after finished product positives. The testimony on this point is clear: Angie Siemens[2] and Cari Dufner[3] testified that there is no number of finished product STEC positives that would cause Cargill to reassess Butler's HACCP plan or its conclusion that STEC is a hazard not reasonably likely to occur (Dufner Deposition, **Exhibit C** at 68:18-69:4), (Siemens Deposition, **Exhibit D** at 69:8-71:3, 71:10-18).

B.  At a time that is unknown, Cargill began its program of ignoring finished product STEC testing data as a metric for assessing whether it was effectively controlling STEC in its ground beef products. As repeatedly asserted by Siemens and Dufner, finished product STEC

---

[2] Siemens is the Vice President of Food Safety, Quality and Regulatory affairs at Cargill.
[3] Dufner is the general manager at the Butler, Wisconsin facility.

results are utilized *solely* to identify and dispose of products that test positive. Ms. Dufner

testified as follows:

> Q.  So you're looking at the microbiological testing data to validate what?
> A.  That we did not ship any product out that tested presumptive positive.
> Q.  So that is all that – in the reassessment process, that is all that you utilize finished product micro test results for is to ensure that none of the products that tested presumptive positive were shipped into commerce?
> A.  Correct.
> Q.  You don't review microbiological testing data to revisit the fundamental determination that the hazard of STEC at receiving is not reasonably likely to occur?
>     MR. BYLUND: Objection to form and foundation.
> A.  No, because our receiving procedure requires for us to review COAs and ensure that results are negative, and that's what the program states. (**Exhibit C**, at 66:10-67:1).

Notably, before petitioning the Court to be allowed to disclose a second expert on beef

processing, Cargill disclosed Kelly Vest as its expert on Cargill's safety program. Mr. Vest had

a different take on both the use of Cargill's STEC data and whether .41% positivity was good or

bad, stating "[i]n my opinion, I would encourage them to do better if they could." (Vest

Deposition, **Exhibit E** at 131:24-25).

C.  Because it does not utilize STEC testing data as a metric to assess whether it is

effectively controlling STEC,[4] Cargill has invented and exploited a loophole in the dictates of 9

CFR 417.5(a)(1) and (2) relating to records retention. In FSIS's "Compliance Guideline HACCP

Systems Validation April 2015," FSIS states:

> The scientific support (design) and in-plant (execution) validation data support the decisions made in the hazard analysis and the adequacy of the process to control those hazards. Therefore, these supporting documents must be kept for the life of the plan to meet the requirements of 9 CFR 417.5(a)(1) & (2). (**Exhibit G** at 28**)**

---

[4] Notably, FSIS is not silent on this issue either. The Q&A section of FSIS Directive 10,010 (**Exhibit F** at 14) states: "to verify that specific controls for E. coli O157:H7 are functioning effectively, establishments should conduct verification testing for E. coli O157:H7." The Directive does not say that verification testing should support only product disposition.

The relevant testimony from Angie Siemens is as follows:

> Q.  But the micro testing data is validation data, is it not?
> A.  No, it is not.
> Q.  Okay. And, therefore, Cargill does not have a regulatory obligation to maintain that data in perpetuity?
> A.  That is my – it is my understanding it has been deemed a set of data that can be removed in our document retention program. (**Exhibit D** at 79:6-17).

This is convenient for a party in litigation who, because it does not analyze STEC testing data to validate that it is keeping STEC out of ground beef products, has deemed itself absolved of 9 CFR 417.5's recordkeeping requirements. As a result, Cargill's historical testing data is rendered effectively undiscoverable. So, as long as the Cargill witnesses (Siemens and Dufner) disclaim any knowledge of historical testing data, as they both did at deposition,[5] Cargill is insulated from ever having to disclose damaging historical data.

As the Court is well aware, Plaintiffs and Cargill spent the entirety of the period from October 6, 2020 through May 20, 2021 fighting over the production of Cargill's historical testing results. They have never been produced, and Cargill admits that the summary data that it has produced is incomplete.[6] Cargill's responses to Plaintiffs' 11th Requests for Production (**Exhibit H,** at page 5) explicitly, and repeatedly, state:

> Responding further, and without waiving or limiting the objections stated above, in an effort to reasonably resolve any potential discovery dispute with Plaintiffs, given Plaintiffs emphasis on testing data, Cargill has again conducted a further diligent search and reasonable inquiry for any relevant summary testing data for the North Butler Plant. As noted previously, such documents are outside of Cargill's standard retention policies and procedures. Notwithstanding Cargill's standard retention policies, Cargill has been able to locate some additional historic summary testing data, some even going back to 2008. To the extent that Cargill has these records for the period prior to 2017, they were preserved outside of normal document retention procedures and they are incomplete. Regardless, Cargill will produce the historic summary testing data that it has been able to locate, including such data that goes back to 2008. To be clear, Cargill's search

---

[5] See **Exhibit D** at 79:18-24. **Exhibit C** at 60:21-61:19
[6] The summary data that has been produced is also inaccurate, and internally inconsistent.

for historic summary testing data was comprehensive and additional summary data beyond what is being produced here is not available for production.[7]

Predictably, Cargill will argue in reply exactly what Cari Dufner stated at deposition: that the only thing Cargill "validates" is that it hasn't sold, or shipped into commerce, finished ground beef that tested positive for STEC.[8] (**Exhibit C** at 66:10-67:1). Aside from the obvious point that this practice, by design, permits Cargill to ignore STEC testing data as a metric to judge its own performance, the practice is also fundamentally inconsistent with FSIS principles that product testing results support—i.e. validate—that the decisions made in the HACCP plan are correct,[9] including Cargill's determination that the hazard of STEC is not reasonably likely to occur at Butler. What Cargill has sought to do, by this and other sleights of hand, is to make the sometimes challenging and expensive job of producing safe meat as easy and trouble free as possible.

D.   In approximately 2015, Cargill changed the language in its supplier requirements program to make *discretionary* what it had previously assured FSIS would be *mandatory* actions with respect to suppliers who demonstrated "a pattern" of being implicated in finished product positive events, or who were implicated twice within 120 days. The 2015 revision to the Global Beef Supplier Approval Program states:

- As part of the finished product testing program, suppliers that receive a notification are required to complete a review of their E. coli O157:H7 control program for relevant production days, and provide Cargill with written confirmation of the review's completion within 5 business days.

---

[7] **Exhibit H**.

[8] What a challenge it must be to produce ground beef that tests positive for STEC and successfully not sell it.

[9] 9 CFR 417.2(a)(1) states, "Every official establishment shall conduct, or have conducted for it, a hazard analysis to determine the food safety hazards reasonably likely to occur in the production process and identify the measures that can be applied to prevent, eliminate or reduce those hazards to an acceptable level. The hazard analysis shall include food safety hazards that can occur before, during, and after entry into the establishment." 9 CFR 417.5(a)(1) requires establishments to maintain all supporting documentation for decisions made in the hazard analysis. Because Cargill has, in its HACCP plan, deemed the shipment of contaminated meat as the hazard to be controlled, rather than the contamination of the meat in the first place, it never has to examine its testing data to validate that the HACCP plan is effectively controlling the contamination of its ground beef by STEC. All it has to do is not ship/sell ground beef that tests positive.

---

- Upon the *third incident within a calendar quarter* **(**for all products except FTB finished products), Cargill *may* contact the supplier to schedule an onsite review audit of the supplier's e. coli O157:H7 control program by a Cargill rep or 3rd party.
- After the *fourth incident within a calendar quarter or sixth incident within two quarters*, the supplier *may* be placed on conditionally approved status and be subject to advanced testing.
- Upon the *fifth incident within a calendar quarter, or the seventh incident within two quarters*, Cargill *may* contact the supplier or schedule an on-site review audit of the suppliers E. coli control program (emphasis added).[10]

Despite Plaintiffs' specific requests for any instance in which the trim suppliers at issue in this case (Schuyler and Dodge City, both Cargill-owned, and Lonestar) have been reprimanded or sanctioned in any way, no such documentation has ever been produced. Angie Siemens testified that, with regard to Schuyler, who was frequently implicated as a supplier in finished product positives, she could not recall any enforcement action ever taken under the supplier program against Schuyler. (**Exhibit D** at 117:6-17)

E.  Cargill implemented a corrective and preventive action (CAPA) program that stifles the flow of information between Cargill and implicated suppliers when finished product tests positive. To start with, in each production lot, Cargill's Butler facility combines trim from multiple suppliers. Although other grinding establishments do the same, this effectively precludes Cargill from ascertaining which supplier produced the contaminated trim. (**Exhibit D** at 125:14 – 126:3) If Cargill cannot ascertain which supplier produced the contaminated trim, then the list of *discretionary* supplier consequences outlined above are pointless, because it cannot be shown which entity Cargill needs to take action against. Indeed, this was borne out in the testimony from Angie Siemens that she cannot recall ever having taken enforcement action against Schuyler. (**Exhibit D** at 117:6-118:4).

---

[10] **Exhibit I**, Global Beef Supplier Approval Program, at CMS000010420.

In addition to serving as a roadblock to supplier enforcement actions, the inability of Cargill to *ever* identify any supplier who produced the contaminated trim also precludes Cargill's ability to learn something in the CAPA process from instances in which it knows there was a contamination event. Again, Angie Siemens:

> Q.  Does Cargill not view instances of finished product positives as an opportunity to learn about potential problems within the system?
>     MR. BYLUND: Objection to form.
> A.  Cargill views finished product testing as a public health benefit in terms of removing product from commerce – commerce that should not – should not be sold – sold to the public. First and foremost is a food safety parameter. Depending on where a positive occurs, right, we can take more action than where other positives occur relative to corrective actions and learning potentials. However, in Butler with a blend, right, it does narrow our ability to learn because we don't know for sure who presented a positive, a potential, you know, contamination.
> Q.  If you did know who had the positive in a blended production lot, that would afford you an opportunity to really drill down and examine processes and what may have gone wrong, right?
> A.  That would be correct. (**Exhibit D** at 125:14 – 126:8).

Finally, to satisfy its self-limited CAPA obligations when positives occur, Cargill's actions begin and end with sending its suppliers a pro-forma letter asking them to review their procedures, and receiving a rote response from the suppliers attesting that a review has been undertaken. (**Exhibit C** at 29:2-7, 36:3-10, 80:15-82:19). In the totality of the various communications between Cargill and its suppliers, including Cargill-owned suppliers Schuyler and Dodge City,[11] the suppliers did not *describe* a single production problem or deviation encountered in producing the trim. To be clear, the suppliers routinely stated that they *identified* deviations, but neither described the deviations encountered nor the corrective actions taken to address the problem, much less any preventive measures to prevent the problem from happening

---

[11] **Exhibit J,** Supplier Complaint Notifications.

again. This is not effective CAPA; it is CAPA engineered to stifle the flow of actionable information.

F. Finally, Cargill touts its finished product testing program—i.e., that it tests samples from each production lot for the presence of STEC—as evidence that it goes above and beyond industry standard in assuring the safety of its ground beef products. In fact, however, Cargill knows that programs predicated on product testing as a substitute for process control are destined to fail, for the simple reason that, to have confidence that negative sample results assure that an entire production lot is negative would require testing—i.e., destruction—of the entire production lot. This is an elementary principle of modern product manufacturing, and not one subject to any reasoned debate. The following are excerpts from the Foundation for Meat and Poultry Research and Education, which has on its board of directors executives from both Cargill and Tyson:

> Another component of verifying a company's food safety process management system is effective is by utilizing microbiological testing. Scientific research indicates that all raw agricultural products – including meat and poultry — naturally may contain bacteria, even pathogenic bacteria. A meat and poultry company's HACCP plans must reflect this fact and address the potential hazards. While a meat and poultry plant's goal is to reduce all bacteria, it is not possible to determine with 100 percent certainty the presence or absence of pathogenic bacteria. Why? Because each microbiological test destroys the sample that is tested. And results only apply to the tested sample. It is possible to pull a 300 gram sample of ground beef, test it and receive a negative result despite pathogen's presence elsewhere in the larger batch. Therefore, pathogen testing of raw meat and poultry should not be a measure of plant's success or failure, but used as a tool within a well-designed HACCP plan to verify the food safety system is working correctly.
> ***
>
> In fact, sampling probabilities indicate that in order to find one percent of *Escherichia coli* O157:H7 in a "lot" of ground beef with a 95 percent confidence rate, 299 samples would need to be taken and tested. This is compared to 2,995 samples that would need to be taken to detect 0.1 percent of *Escherichia coli* O157:H7 with a 95 percent confidence rate. Currently, the U.S. Department of Agriculture's Food Safety and Inspection Service (FSIS) data reports the prevalence level of *E. coli* O157:H7 in 2010 was 0.24 percent, which means thousands of tests would be needed to detect that level. Again, each test would

destroy the sample. For these reasons, pathogen testing and "pass/fail" standards do little to enhance meat safety while destroying large quantities of safe product that could have been consumed safely and purchased cheaper. Foundation for Meat & Poultry Research & Education, "Microbiological Testing," https://www.meatpoultryfoundation.org/fact-sheets/microbiological-testing (September 17, 2021).

Cargill's sampling program, for the product at issue, involves STEC testing on a single 5.3 oz patty every 15 minutes of production. (**Exhibit D** at 46:9-13) During a 15 minute production window, Cargill's blenders produce thousands of pounds of patties. It took three pages of deposition transcript (**Exhibit C** at 39:8-42:1) before Cari Dufner would answer the following specific question:

> Q: Is the reason that Cargill does not reassess its HACCP plan after receiving finished product positives because Cargill believes that its testing program will detect any instance of product contamination by STEC?
>         MR. BYLUND: Objection to form and foundation.
> A: *Yes*. We do not reassess because we follow our policies and procedures, and when a presumptive positive is tested or when that comes up, we do put our product on hold, yes. (*Id*. at 41:16-42:) (emphasis added)[12]

Stillwell is, of course, critical of Cargill's sample size, but is even more incredulous regarding Cargill's reliance on negative samples as a measure of safety, given the process control failures that it has woven into its system, and allowed to metastasize.

It is not Plaintiffs' contention that Cargill wants to produce contaminated ground beef; nor is it Plaintiffs' contention that Cargill has never done anything to improve its performance. Rather, it is Plaintiffs' contention that Cargill has intentionally engineered a system in which it is insulated from comparison to any standard whatsoever, and where certain key pieces of information that other beef producers utilize for constructive purposes, in Cargill's universe, don't matter and no longer exist. Scott Stillwell is the only witness in this case who can testify

---

[12] Dufner later asserted again that Cargill believes it identifies all instances of STEC contamination through testing at **Exhibit C** at 59:17-22.

about Cargill's conduct. Sodexo disclosed nobody on these issues, not wanting to highlight its own failures surrounding the production of hamburgers, and Plaintiffs are only entitled to one expert on these issues. Thus, Scott Stillwell is the only non-Cargill expert on beef production, and is therefore the only witness willing to say: that other companies do it differently; that data matters, whether it be good, bad or ugly; and that there are, in fact, standards against which to judge Cargill's conduct.

### III.   ARGUMENT

The Court's gatekeeping function under *Daubert* is not intended to supplant the adversary system or the role of the jury: rigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking expert opinion testimony. *Eisenbise v. Crown Equip. Corp.*, 260 F. Supp. 3d 1250, 1257-60 (S.D. Cal. 2017). Disputes as to the strength of an expert's credentials, faults in his use of a particular methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).

#### A.   What Cargill deems "unreliable methodology" is desperation to keep out of evidence Scott Stillwell's far more rigorous approach to keeping STEC out of ground beef

Scott Stillwell's written report (**Exhibit K**) is 36 pages long. His deposition lasted 7 hours. Clearly, he articulates many more opinions than the several that Cargill addresses in its motion. Plaintiffs will address those opinions in turn, but first address what they understand to be an argument that he is not qualified as an expert and should be excluded from this litigation entirely.

Cargill first states that Stillwell lacks formal education and training in beef processing, beef regulations, microbiology and statistics. Motion at 10. Fed. R. Evid. 702's criteria for qualification of expert witnesses is not limited to "formal education and training." The rule

includes, as additional bases for qualification, the witness's knowledge, skill, experience, training, or education. Regardless, Stillwell does have formal education and training in microbiology and statistics.

Stillwell's affidavit (**Exhibit L**) details his experience and formal education in microbiology (*Id.* at ¶2, 3-7, 10) and statistics (*Id.* at ¶11), and includes all of the coursework that Cargill possessed when drafting its motion, but elected to omit in favor of pointing to the "F" that he earned in microbiology 35 years ago. While it is true that Stillwell's educational career was not linear in the traditional way, and that he did not earn a Bachelor's degree and Ph.D. until later in his career, having already spent two decades as the food safety chief for a company that has a much larger market share of the beef industry than Cargill, it is a misrepresentation to state that Stillwell does not have education, training, experience and knowledge in microbiology and statistics.

Cargill's argument surrounding beef processing and beef regulations appears to be that Stillwell is just a "chicken guy"—i.e., that the bulk of his 31 year career at Tyson was spent in the field of poultry, not beef. Again this is untrue. As is set forth in his affidavit, Stillwell spent over 20 years working with beef safety specifically (**Exhibit L** at ¶12, 16, 17), including everything from microbial analysis to HACCP development and implementation to developing and validating, along with other industry members and FSIS, testing protocols and standards for ground beef production. (*Id.* at ¶8-10, 16, 17)  Notably, Stillwell was working with FSIS and the gang of six ("G6") major beef producers in the 90s and early 2000's, long before Angie Siemens even started at Cargill. *Id.* Scott Stillwell is qualified to opine on Cargill's conduct by his knowledge, skill, experience, training, *and* education.

It is worthy of note, here, that until Cargill was allowed to disclose a second expert on beef processing, its sole retained expert on beef production was Kelly Vest. At deposition, Vest testified that he has never worked in or consulted with a beef grinding establishment that produces fresh or frozen ground beef products. (**Exhibit E** at 19:3-6, 15-19)[13]

Again, in *these cases*, with so much on the line for the Plaintiffs and Defendants alike, including Cargill, Cargill selects a person as its sole expert who has *never* worked with fresh or frozen ground beef products in his career. Yet it elects to file a *Daubert* challenge against the man who ran one of the biggest beef production companies in the country for decades? The irony is difficult to ignore. Consider also, why did Cargill go to Kelly Vest? The answer is that Cargill did not want to disclose the way it conducts business, or its STEC data, to anybody who has any weight in the beef industry.

Cargill next claims that Stillwell's methodology is unsound because he "misinterprets regulations and invents standards, which he then opines that Cargill did not satisfy." Motion at 12. The essence of Cargill's argument is that FSIS's MT43 testing data provides no metric against which to assess an individual establishment's performance. Bearing in mind that Cargill also does not utilize its internal testing results as a metric for its STEC performance, Cargill's argument, again, is that there is no standard whatsoever against which it should be judged, and that as long as Cargill's finished product positives are under 1%, it is free to produce as many as 100 positive lots out of 10,000, never reassess its HACCP plan, and that this is all acceptable to FSIS.

---

[13] Vest testified that the two beef producers he has consulted for produce ground products that will be cooked before being sold to consumers. *Id.* ("[t]hey have a kill step and so its cooked product after its ground.") Thus, the STEC risk profile for the beef products Vest has worked with is non-existent.

There are multiple points to be made. First—anticipating Cargill's reflexive response that FSIS has blessed everything about its food safety/HACCP program—FSIS makes clear that it is Cargill's job, not FSIS's, to design and implement a program that controls STEC. FSIS states: "It is the establishment, not FSIS, that determines and supports how to best address E. coli 0157:H7 in the beef fabrication process of its raw ground or raw not-ground beef HACCP plan."[14]

Second, industry participants regard as proprietary their internal STEC testing data. It is not shared, and therefore there is no comparison to be made, in this case, to verification/finished product testing data from other industry participants. (Stillwell Deposition, **Exhibit M** at 180:1-14)

Third, Tyson has always had an internal policy in which each grinding establishment's internal testing data is compared to the MT43 data, which, in the first eight months of 2017 was roughly .07%. As Stillwell explained at deposition,

> We have a stated management objective [at Tyson] that every facility be at or below – statistically analyzed at or below the FSIS published data for MT43 or whatever the current – whatever the year period is, whatever is available from the FSIS testing that is comparable. (**Exhibit M** at 180:22-181:2)

Fourth, with regard to Cargill's assertion that Stillwell invented a standard of .2% positivity being acceptable, this is wrong for two reasons: (a) the .2% figure is not Stillwell's "invented standard," it is *FSIS's* goal for positivity, in *2007*, as articulated in FSIS Notice 65-07 (**Exhibit N**, FSIS Notice 65-07)[15]; and (b) the MT43 results for the time period relevant in this case is not .2%, it is .07%. Further, and again with reference to Cargill's anticipated argument

---

[14] USDA, "askFSIS Public Q&A: Processing Establishment's need for a CCP for Raw Beef Fabrication," https://ask.usda.gov/s/article/Does-Food-Safety-Inspection-Service-mandate-that-an-official-processing-establishment (September 17, 2021).
[15] FSIS's target rate, and cause for concern, is identified at paragraphs A 1-3 of Attachment 2 to the FSIS Notice 65-07: "FSIS has established a maximum target percent positive rate of 0.200% at any time in the calendar year."

that FSIS has blessed everything about its HACCP plan, as well as Cargill's STEC data, Notice 65-07 clearly articulates FSIS's concern that, *in 2007*, verification testing showed a positive rate of .208%. If, ten years later, Cargill was running at twice the concerning level that FSIS identified in 2007, what must FSIS think of .41% in 2017?[16]

Fifth, MT43 data are routinely used as comparison data points for STEC performance of the beef industry. Again, Tyson utilizes the current MT43 positivity rate as a metric to assess its STEC performance every quarter. Also, none other than the North American Meat Institute (NAMI, formerly AMI, who counts Cargill as a member), relies on the data as a performance metric. NAMI has addressed, in various forums and publications, the same issues that the parties are now briefing for this Court. For instance, in a 2009 article,[17] then NAMI-president Jim Hodges stated, with regard to MT43 data, that

> …the fact is, *everyone uses these numbers to look at trends – FSIS does it, CDC does it, everyone does it*. If we wanted to be perfectly accurate, we'd say there has been a significant reduction in *E. coli*, but people want to know how much, so we use percentages to show a trend… Hodges continued, "[o]ur numbers probably over-estimate the prevalence of *E. coli*. They're regulatory samples and tend to be biased toward where the problems are. *But they're the best data we've got. To not use them is a complete disservice to the public*." (Emphasis added).

Additionally, in 2016, during her ongoing tenure as Cargill's food safety chief, Angie Siemens gave a presentation on behalf of NAMI in which she touted industry progress in reducing STEC in ground beef by citing FSIS MT43 test results. In the presentation (**Exhibit P**) she included three different slides reflecting industry percent positivity rate according to MT43 test results.

Finally, as Stillwell states in his affidavit:

---

[16] For an answer, see Stillwell's communications with FSIS, **Exhibit O** (Plaintiffs 001000) discussed later in this brief.

[17] Meat + Poultry, "War of Numbers," https://www.meatpoultry.com/articles/19121-war-of-numbers (September 17, 2021).

19.     The utilization of FSIS verification testing data has been a significant point of discussion among the beef industry members and FSIS. In the early 2000s, leading up to and after establishment of the G-6 ("Gang of 6" large beef processors working collaboratively to protect public health, the industry reputation, and mitigate FSIS enforcement activity), benchmarking against the FSIS test results (as the "standard") was considered the best approach as those data were publicly available, highly visible, and performance worse than those results was deemed to put manufacturers (and the broad ground beef producing industry) at risk of FSIS enforcement action. Failure to meet or exceed the standard could form the basis for disqualification as a supplier to many customers.

20.     During the decade of the 2000s, the FSIS surveillance test results were discussed at every monthly FSIS-Industry meeting (those meetings continue to this day). The G-6 and monthly meetings with FSIS facilitated industry discussions of raw beef microbiological control challenges, what did / did not work, and the formulation of industry policy recommendations to drive both industry standards and FSIS policy. Each industry representative recognized and openly discussed (such discussions frequently facilitated by Dennis Johnson, Esq.) that failure to perform at or below the FSIS generated raw ground beef sample results placed their company reputation and the continued operation of their processing facility(ies) at risk.  (**Exhibit L**)

Cargill simply does not like to utilize MT43 testing results as a data point because of the way its own data looks when compared to it. As Cargill notes in the Motion at 13:7-8, Butler's positivity rate was seven times the MT43 standard for 2017. Cargill would prefer, as stated in its Motion at 13:5-8, to compare Butler's *facility-specific* MT43 testing results to the MT43 data, because MT43 testing results at Butler showed zero positives.[18] This issue was fully briefed during the fight over Plaintiffs' 4th Amended Complaints, and the same arguments apply now. (See ECF No. 282, Plaintiffs' Reply to Cargill's Opposition to Motion for Leave). MT43 test results at Butler included between 16 and 32 tests total during the first eight months of 2017, while Cargill's far more robust sample set during the same period included almost 10,000 lots of finished product.

---

[18] Although Cargill declines to utilize its internal STEC testing data as a metric to assess performance, it relishes the opportunity to assess performance based on the FSIS MT43 results for Butler, which included a paltry 16-32 total samples during the first eight months of 2017. This sample set showed zero positives. Siemens testified that FSIS test results are a "data point in our assessment of our facilities," but that its own internal STEC testing results are not. (**Exhibit D** at 51:9-10, 53:5-15, and 54:2-14).

Finally, Cargill argues that MT43 data are unreliable because MT43 data are "dissimilar in sample collection, frequency of tests, and results reported." Motion at 13:10. Cargill's statement is true, but only as far as the statement goes. MT43 is a different testing scheme than Cargill's internal finished product testing, but both have one objective: to detect the presence of STEC.

Therefore, while Cargill can certainly point out the differences in the testing schemes to the jury, the MT43 data is not unreliable in any respect. It is merely a data point that, in comparison, makes Cargill's performance look poor. But Cargill's remedy is not to exclude the data; it is cross examination and the presentation of contrary evidence. Finally, Cargill's citation to case law allegedly supporting its position on this issue is mystifying. *Hankey*, *IGT*, and *Newkirk* appear, to Plaintiffs, to have no relevance whatsoever.

Cargill next contends that Stillwell's methodology is unreliable because he has "corrupt[ed] the NRLTO hazard designation." Motion at 13:20. Cargill points out that the determination that the hazard of STEC is NRLTO (not reasonably likely to occur) at receiving—i.e., when a grinding establishment receives trim—is a widely utilized hazard determination among industry grinders. Stillwell agrees with that. In fact, Tyson employs the same designation—but only where the data actually support that determination.

FSIS itself has commented specifically on this subject. The Q&A section of FSIS Directive 10,010 contains the following discussion:

> Question: An establishment has thousands of negative test results for E. coli O157:H7. At what point can an establishment conclude that E. coli O157:H7 is not reasonably likely to occur based on these negative test results?
> Response: FSIS cautions that it would be unwise for an establishment to conclude that the pathogen is not reasonably likely to occur based on numerous negative test results for the pathogen. *FSIS has previously advised that establishments should strongly consider the possibility that E. coli O157:H7 is a hazard reasonably likely to occur in their production of beef products, especially if an*

*establishment produces non-intact product* [e.g. ground beef] *that has been or could be adulterated with E. coli O157:H7* or produces intact product that is to be used for non-intact product, and this non-intact product has been or could be found to be adulterated with E. coli O157:H7 (67 FR 62329)." (**Exhibit F** at 14) (emphasis added)).

Also, FSIS Directive 5000.6 states as follows: "If an establishment does not effectively design or inconsistently implements its prerequisite program *and the applicable hazard occurs, the prerequisite program provides ineffective support that the hazard is NRLTO and there is noncompliance with 9 CFR 417.5(a)(1).*" (**Exhibit Q** at 8 (emphasis added)). The Directive continues: "repeated failure to implement procedures in a prerequisite program, *or evidence that the program is not effectively preventing the hazard, is an indication that the establishment does not have adequate support for the relevant decisions in its hazard analysis.*" (emphasis added).

Even *Cargill's own definition* of "hazard reasonably likely to occur" is supportive of Stillwell's opinion. "A food safety hazard that is reasonably likely to occur is one for which a prudent establishment would establish controls *because it historically has occurred.*" (**Exhibit C** at 67:7-68:1). As Stillwell observes, the repetitive production of STEC positive finished products clearly shows that the hazard of STEC *is* occurring at Butler.

This helps to bring into proper relief both Siemens and Dufner's testimony that there is no number of finished product positives that would ever cause Cargill to reassess its HACCP plan or reassess the NRLTO hazard designation. In defiance of logic, data, its own hazard definition, and FSIS guidance on the matter, Cargill simply refuses to change.

As a last point on this issue, Plaintiffs again direct the Court to the FSIS communications with Stillwell (**Exhibit O** at 001000). Dr. Stillwell asked: "How many positive test results in a given time frame would be acceptable to continue concluding that the Hazard is NRLTO?" FSIS responded:

There is no required number or universal frequency here. It's about reaching a logical and supportable conclusion. It's like asking, "how many times can a dog bit[e] someone before folks should stop thinking it won't bit[e] someone?", or "how many times does a tornado need to hit an area before folks stop thinking a tornado won't hit the area?", or "how many times does someone need to be late for an appointment before you stop thinking they will be on time?", or . . . (you get the picture). How many times does something need to happen before folks should stop concluding it won't happen? There is no universal answer there. Now, I realize those aren't perfect analogies, but the default answer is "once", if it happens "once" then the decision-making needs evaluated. If you investigate the situation, can explain why it happened and provided a logical and supportable rationale for why it won't happen again, then you [may] keep the decision-making. The dog was injured/startled, it was a "once in 100-year storm," they got in a car accident and were late – those may be logical justifications for why the situation is vey unlikely to happen again. But you see, if it historically happened "once", why won't it happen again? There is no universal answer. Unless you can explain and articulate why it happened this time and why it won't happen again, why would you observe it happen once and conclude it won't happen again? It comes down to that why, which can be different in different situations.

The discussion continued (**Exhibit O** at 001009):

As you probably know, when you get into gray areas, different folks using sound professional judgment can sometimes reach different conclusions, depending on the unique factors of the situation. But it doesn't sound like that's the case here. You are evaluating things rationally and logically, and it sounds like there is actually cause for concern. Not so much just the numbers or rates, but the lack of action taken in response to the continued recurrence of the problem. It's one thing to get that rate from product off the slaughter/fab line that has never been tested, but highly unusual to get that rate from product that is already supposed to be negative.[19] Something weird is happening. Yea, you are on the right track and evaluating it well and if the details you provided are anything near factual (source material already tested negative, number of positives, timeframe, etc.) it would certain raises some serious eyebrows and should prompts many more questions. Again, not to say something is automatically wrong per-se, but the evidence suggests everything isn't all correct either…good luck.

Next, Cargill contends that Stillwell's methodology is unreliable because he testified, at deposition, that Cargill should conduct a "root cause" analysis for each finished product STEC positive test. Exactly how this makes Stillwell's opinion unreliable, as opposed to merely

---

[19] This is a reference to the fact that the trim originally tested negative before being received at North Butler.

contrary to Cargill's approach, is not explained. But this only points to the different perspectives on the role of grinding establishments in ensuring the safety of their products. On the one hand, Cargill and Angie Siemens do not utilize STEC test results as a metric to assess whether they are effectively controlling STEC; they argue for the imposition of no standard whatsoever to judge themselves; they reflexively, and without support, annually validate the faulty determination that the hazard of STEC is NRLTO at receiving; and they engage in deficient, rote CAPA after positive test results. On the other hand, Scott Stillwell demanded constant improvement during his time at Tyson; he articulates viable standards against which Cargill should be judged; and he describes an effective approach to CAPA, focusing on positive STEC tests as an opportunity to drill-down on production problems to ensure that they do not repeat themselves. The following colloquy from Stillwell's deposition is illustrative:

> A. Causes should be identified 100 percent of the time, 99.999 percent of the time. In my conversations with senior FSIS officials, they -- they recognize that very infrequently you're just going to come up blank, stumped. Things happen, and you -- in -- in reality of the real world of -- of food manufacturing, given sufficient data and a diligent enough search, you can find things that are less than ideal.
> Q. And the -- finding something that's less than ideal, is that necessarily the cause of that particular presumptive positive?
> A. It may not be. As I described a couple of hours ago, you take a shotgun approach. You identify all of those opportunities for improvement that you can, address all of them, and then watch your data to see whether you've made an improvement.
> Q. So it's not that you would be able to identify the root cause of a particular presumptive positive, but every time you go and look at your system, you should be able to find something wrong with it?
> A. You should be able to find opportunities for improvement. And those data -- and -- and the fact that your -- your finished product test results data aren't improving, absent any individual positive, those data alone should tell you to go examine your process and do something. Fix it. It's not working. So the data have to be looked at holistically. (**Exhibit M** at 247:17-248:20)

Cargill's final argument about Stillwell's unreliable methodology is that he "implies" that a reassessment of Cargill's HACCP plan should have been done each time the Butler plant

generated a positive STEC result. In fact, Stillwell did not "imply" that a reassessment is necessary; it *is* necessary, according to both his opinion and FSIS regulations. Again, Stillwell acted on the data during his time at Tyson, including reassessment when positives occurred, and Cargill simply does not. The reassessment issue is the subject of Cargill's Motion in Limine (ECF No. 339), but for present purposes, it suffices to say that (1) the FSIS stated specifically that Cargill should reassess after positives in the Notice of Deferral (**Exhibit B** at 000750-751); (2) FSIS reiterated that position in the FSIS communications (**Exhibit O** at 1004); (3) FSIS Directive 5000.6 (**Exhibit Q** at 6), which provides instruction to FSIS inspectors ("Inspection Program Personnel" or IPP) concerning conduct of the Hazard Analysis Verification (HAV) task, states as follows: "Do the establishment's records contain information that indicates a reassessment of the hazard analysis or HACCP plan is necessary (e.g., CCP deviations, *positive pathogen results*, repeated sanitary dressing failures)?"; and (4), as will be shown in Plaintiffs' response to Cargill's Motion in Limine, FSIS regulations are clear that, for an entity like Cargill's Butler facility that does not address STEC in its HACCP plan, a positive test represents an "unforeseen hazard," for which reassessment is necessary.

In the end, Cargill's complaints about Scott Stillwell are merely sour grapes. Cargill is free to make its argument to the jury that MT43 data provides no metric against which to assess its STEC performance, but it has not made a showing that MT43 data is unreliable. Nor has it shown that any of its other arguments about reliability are anything other than differences of opinion and approach.

B.   **Cargill misrepresents Scott Stillwell's opinion that there is a 95% certainty that Cargill produced and distributed contaminated ground beef**

Cargill's distorted summary of Stillwell's testimony on this issue needs to be corrected. The operative statement in Stillwell's report is as follows:

How likely was it in 2017 that the finished product sampling program at Butler missed a contaminated lot and allowed those products to ship? The answer is, 'the probability is much greater than zero'. To establish a numerical estimate requires data that have not been produced or are otherwise not available. (**Exhibit K** at 21.)

At deposition, after confirming Stillwell's agreement with his written statement, Cargill's attorney engaged in the following colloquy:

Q. And even though it's not possible to estimate the probability that a specific lot is contaminated, you are 95 percent sure that the beef shipped to Sodexo in -- in the September/October time frame of 2017 was contaminated?
A. I didn't say that. I said that it is likely -- 95 percent likely that at some time in 2017, Cargill shipped contaminated product. I have made no association specifically to the Sodexo product. But when you look at the serial -- the series of events that has to happen for a large number of people to get sick, the -- the gross breakdowns that has to occur all along the process, including preparation and serving to the consumers, in order for all of those things to happen, it is highly likely given what I know about their general production and manufacturing controls that that lot left the -- or left the Cargill facility contaminated. (**Exhibit M** at 153:11-154:3)

Plaintiffs did not retain Stillwell for his epidemiologic opinions. Counsel asked a question that required a response and, as a direct contradiction of what Cargill says in the Motion, Stillwell specifically replied that "I didn't say" what counsel's question implied that he did. He then went on to incorporate other aspects about this outbreak, of which he is generally aware—e.g., Sodexo's production failures on October 21, 2017, and Cargill's historical production failures— in order to fully answer counsel's question. If counsel did not want to know his opinion on the question asked, then she should not have asked the question. Regardless, Plaintiffs have not retained Stillwell to opine on epidemiologic questions, and therefore the issue that Cargill conjures for the Court's consideration is moot.

C.     **Cargill has not demonstrated that Stillwell lacked sufficient data to form conclusions on the issues described at IV.B.3 of its brief**

With respect to Cargill's formulation of Stillwell's opinions at section IV.B.3 of its Brief, Cargill has not shown that Stillwell lacked sufficient data:

- The graph at page 15 of Stillwell's report—the report will not come into evidence, and Stillwell acknowledged at deposition that the graph was not an accurate chronological representation. Plaintiffs will have a graph at trial that shows Cargill's STEC performance in chronological fashion, but will also communicate to the jury that Cargill has destroyed, and not produced, STEC testing records because of the loophole that it created and exploited in the record-keeping regulations.
- Cargill's sample size—Stillwell is highly critical, given the foolishly inordinate weight Cargill places on finished product testing, of Cargill's sample size. For a man who devoted his career to microbial food safety in meat products, Stillwell does not need Cargill's "homogeneity data," because their blenders do not magically produce homogenous product; nor are they intended to do so, because a truly homogenized beef and fat product is called bologna.
- Cargill's lack of "meaningful" change—this is a difference of opinion. Stillwell and Siemens have different views of what constitutes a "meaningful" effort to improve performance. His primary criticism on this issue, given Cargill's repetitive positive STEC tests that were seven times the industry's rate of positivity, is that Cargill did not employ an intervention intended to reduce or eliminate STEC, like PAA, in its grinding operation at Butler. Cari Dufner validated the factual point, stating specifically that Butler does not employ an intervention intended to reduce or eliminate STEC. (**Exhibit C** at 33:12-24). Cargill is free to argue to the jury that it made "meaningful" changes in light of its STEC testing data, but Stillwell certainly does not lack a fact basis to offer a different opinion.
- The adequacy of process controls at supplier facilities—Stillwell does say in his report that he lacks adequate, specific data to assess controls at the supply facilities, but this is not because Plaintiffs didn't request the data. They did, and Cargill did not produce the data requested. Regardless, Stillwell's conclusion that the supply facilities did not have adequate process control is a valid inference to make given (1) that STEC would only get into the Butler facility on trim produced by its suppliers (**Exhibit C** at 57:13-58:25); and (2) Cargill repeatedly produces finished product that tests positive for STEC. Therefore, Stillwell does not have inadequate facts to render this opinion.

**D**.    <u>**Cargill's remedy for any of Stillwell's opinions for which he alludes to his experience at Tyson is cross-examination and the presentation of contrary evidence**</u>

Cargill is free to argue to the jury that it's food safety program sets the standard against which others should be judged. Cargill is free to argue to the jury that STEC tests are irrelevant,

and should not be used as data on which to validate whether it is effectively controlling STEC. Cargill is free to argue to the jury that its self-defeating CAPA program is better than the rigorous approach that Scott Stillwell articulates. Cargill is free to argue to the jury that Siemens and Cargill do it right, and Stillwell and Tyson did it wrong.

But the fact that Stillwell's basis of experience is at one company is not a basis on which to exclude any of his opinions. Has Siemens any broader experience as a food safety chief at a beef processor than her experience at Cargill?[20] Should she also be excluded from offering expert opinions that are contrary to Stillwell's, based on her singular experience at Cargill? Should Cargill's two experts on beef processing be excluded for the reason that *neither has ever* worked for a company that produces fresh or frozen ground beef?[21] Again, the answer is no. This is all just material for cross examination.

Regardless, the only opinion that Cargill actually identifies in section IV.C of its brief is Stillwell's opinion that Cargill should have applied PAA during grinding. Again, Cargill is free to argue to the jury that Stillwell is wrong, and that Cargill rightly rejected *its own internal studies on the efficacy of applying PAA during grinding*. These studies validated Dr. Stillwell's opinion in every respect, showing a 4-log reduction in *E. coli* when applied to trim at North Butler prior to grinding (**Exhibit R**, PAA studies).  It is up to the jury to decide who is right.

### E.     The FSIS Communications

Cargill levels many accusations at Stillwell surrounding his communications with FSIS, but, for purposes of Cargill's Motion, it is perhaps more important to observe what Cargill has

---

[20] The answer is no. She previously worked at Smithfield Meats, which is a pork producer.

[21] As stated previously, Kelly Vest has never worked with or for a company that produces fresh or frozen ground beef products. **Exhibit E** at 19:3-6, 15-19. Cargill's second expert, Mindy Brashears, Ph.D., before and after her brief tenure as FSIS Undersecretary for Food Safety, has never worked for a beef producing company.

not argued: that Stillwell got any of the facts wrong, or that the FSIS official's analysis was unsound.

Indeed, had Mindy Brashears (Cargill's second beef processing expert) not, at deposition, validated Stillwell's facts and the official's analysis, Cargill would certainly have argued that one or both of them got it all wrong. But her deposition testimony is conclusive:

> Q: [D]o you have any specific areas where Stillwell misrepresented, not his identity, but the factual circumstances supporting his questions to FSIS?
> A: I do not recall any specific portion that he had misrepresented. (Brashears Deposition, **Exhibit S** at 138:13-18)
> ***
> Q: In terms of the technical analysis offered by the FSIS's representative, though, was it sound? Was it unsound? What's your opinion on it?
> A: It was sound . . . . (*Id.* at 137:19-22)

Thus, Cargill is left with the proclamations that Stillwell lied, is biased, and, if he had to ask these questions of FSIS, did not truly understand the subject matter on which he has opined. As Plaintiffs have previously observed in other briefing to this Court, Stillwell's final expert report was disclosed on January 19, 2021, and the communications at issue with FSIS occurred on February 1-3, 2021. In questioning FSIS, he was not seeking information on which to base opinions that he had already formed. He was merely so shocked at Cargill's system and data that, as he stated to FSIS, "I'm just trying to make sure I'm not a crazy, doddering old man!" (**Exhibit O** at 1009). Cargill's remedy on this issue is cross examination and the introduction of contrary evidence.

## IV.   <u>CONCLUSION</u>

For reasons stated, Cargill's Motion should be denied. Stillwell is qualified, has articulated reliable opinions that will assist the jury in understanding the issues, and has built those opinions entirely on actual facts and data. That Stillwell has unmasked a company that has sought to fly below the radar is not a criteria for exclusion under *Daubert*.

Respectfully submitted:

 Dated:  September 17, 2021

                                        /s/ Frederic L. Gordon
                                        Frederic L. Gordon
                                        Attorneys for Plaintiffs