1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                  SOUTHERN DISTRICT OF CALIFORNIA
10

11   VINCENT GRANO,                     Case No.: 3:18-cv-1818-RSH-BLM

12                         Plaintiff,
                                        **ORDER:**
13        v.
                                        **DENYING DEFENDANTS'**
14   SODEXO MANAGEMENT, INC., et al.,   **MOTION TO EXCLUDE THE EPI-**
                                        **AID REPORT, CASE-CONTROL**
15                       Defendants,    **STUDY, & REFERENCE TO 9**
                                        **C.F.R. § 417.3(b)** [ECF No. 337]
16   AND RELATED CASES.
                                        **DENYING AS MOOT**
17                                      **DEFENDANTS' MOTION TO**
                                        **EXCLUDE THE DECLARATION**
18                                      **OF DR. KEATON** [ECF No. 379]
19
                                        **DENYING & GRANTING IN PART**
20                                      **DEFENDANTS'** *DAUBERT*
                                        **MOTION REGARDING DR. KIRK**
21                                      **SMITH** [ECF No. 338]
22
                                        **DENYING DEFENDANTS'**
23                                      ***DAUBERT* MOTION REGARDING**
                                        **SCOTT STILLWELL, PH.D.** [ECF
24                                      No. 339]
25
                                        **DENYING DEFENDANTS'**
26                                      ***DAUBERT* MOTION AS TO DR.**
                                        **MICHAEL MONT & DENYING**
27                                      **WITHOUT PREJUDICE**
28

                                    1

**DEFENDANTS' MOTION AS TO DR. ROBERTO CIVITELLI AS MOOT** [ECF No. 346]

**DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS** [ECF No. 341]

**DENYING CARGILL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PUNITIVE DAMAGES** [ECF No. 343]

**DENYING AS MOOT CARGILL'S MOTION FOR SUMMARY JUDGMENT ON SODEXO'S CROSS CLAIMS** [ECF No. 342]

**DENYING & GRANTING IN PART US FOODS' MOTION FOR SUMMARY JUDGMENT & ORDERING SUPPLEMENTAL BRIEFING WITHIN 14 DAYS OF THIS ORDER** [ECF No. 340]

The Parties have had nine motions pending in this case for over a year: two motions in limine, three *Daubert* motions, and four motions for summary judgment. The Court addresses each motion separately below.

## I.    BACKGROUND

In October 2017, an outbreak of Shiga toxin-producing *Escherichia coli* O157:H7 and O26 ("STEC") at U.S. Marine Corps Base Camp Pendleton (Edson Range) and the Marine Corps Recruit Depot sickened at least 244 Marine Corps recruits. *See* ECF No. 312 at 3.[1] Fifteen of those recruits developed Hemolytic Uremic Syndrome, a condition where the small blood vessels in a person's kidneys become inflamed and damaged, leading to

---

[1]    All citations to electronic case filing ("ECF") entries refer to the ECF-generated page numbers.

clots that inhibit the proper filtering system in the kidneys and that can result in potentially life-threatening acute renal failure. *Id.* at 3.

Epidemiologists and medical professionals from the U.S. Navy and the Centers for Disease Control and Prevention ("CDC") swarmed to the center of the outbreak to investigate. *Id.* at 3.[2] On November 19, 2017, the CDC deployed an Epidemiologic Assistance ("Epi-Aid") Team to San Diego.[3] ECF No. 337-2 at 7. The Epi-Aid conducted an environmental investigation, food and environmental testing, and a case-control study. *Id.* at 8.[4] The CDC's case-control study included surveying and interviewing 43 STEC patients and 135 healthy controls, as well as inspecting the recruits' sleep quarters, bathroom facilities, and the cafeterias. ECF No. 312 at 3. After concluding its investigation

---

[2]     "The field of epidemiology addresses the incidence, distribution and etiology (causation) of disease in human populations by comparing individuals exposed to a particular agent to unexposed individuals to determine whether exposure increases the risk of disease." *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1172 (N.D. Cal. 2007) (quoting *In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 892 (C.D. Cal. 2004)).

[3]     "An Epi-Aid is an investigation of an urgent public health problem, such as infectious or non-communicable disease outbreaks, unexplained illnesses, or natural or manmade disasters. When a public health authority requests assistance from the U.S. [CDC], an Epi-Aid allows rapid, short-term (1–3 weeks), generally onsite, technical assistance by Epidemic Intelligence Service (EIS) officers and other CDC subject matter experts. The focus of an Epi-Aid investigation is to assist partners in making rapid, practical decisions for actions to prevent and control the public health problem." U.S. Ctr. for Disease Control & Prevention, *Epidemiologic Assistance (Epi-Aids)*, Epidemic Intelligence Service (Mar. 22, 2018), https://www.cdc.gov/eis/request-services/epiaids.html.

[4]     A case-control study "starts with a group of people who have the disease of interest (the 'cases'), selects a similar population of people without the disease (the 'controls'), and then compares the groups on the basis of past exposure to the chemical the investigators are studying." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1116 (N.D. Cal. 2018). "Frequently touted benefits of case-control studies are their comparatively low cost and ability to identify associations relevant to rare diseases." *Id.*

and case-control study, the CDC summarized its findings in a report dated January 23, 2018. *Id.* at 4.

Plaintiffs are Marine Corps recruits who allege that the ground beef patties (i.e., hamburgers or cheeseburgers) served in the cafeteria on October 21, 2017, were responsible for the outbreak. *Id.* at 4. Defendant Cargill Meat Solutions Corp. ("Cargill") allegedly manufactured and produced the patties. *Id.* at 20. Third-Party Defendant US Foods, Inc. ("US Foods"), allegedly received, stored, refrigerated, distributed, and delivered the beef patties to Defendant Sodexo Management, Inc. ("Sodexo"). ECF No. 128 at 3. Sodexo, which was under contract to provide food service at all Marine garrisons and mess halls during the relevant time, allegedly prepared and served the hamburgers and cheeseburgers on October 21, 2017. ECF No. 312 at 5-6.

## II.     PROCEDURAL POSTURE

This is one of seven related cases filed by Marine recruits.[5] Plaintiff Vincent Grano filed his lawsuit first on August 3, 2018. ECF No. 1.[6] The Court consolidated the seven related cases for all motion practice and designated Grano's action as the Lead Case File on March 9, 2020. ECF No. 88 at 2; *see* ECF No. 79.

Plaintiffs' lawsuit also triggered a slew of additional claims. Cargill filed a cross-claim against Sodexo on December 5, 2019, for breach of the indemnification provision of an agreement between the Parties. ECF No. 53. Sodexo filed a competing cross-claim

---

[5]     The six related cases are: *Anderson v. Sodexo Mgmt. Inc.*, No. 3:19-cv-01903 (S.D. Cal.); *Baker v. Sodexo Mgmt. Inc.*, No. 3:19-cv-01904 (S.D. Cal.); *Browning v. Sodexo Mgmt. Inc.*, No. 3:19-cv-01905 (S.D. Cal.); *Evers v. Sodexo Mgmt. Inc.*, No. 3:19-cv-01907 (S.D. Cal.); *Lader v. Sodexo Mgmt. Inc.*, No. 3:19-cv-01908 (S.D. Cal.); and *Abbott v. Sodexo Mgmt. Inc.*, No. 3:19-cv-01917 (S.D. Cal.). The Court previously dismissed four related cases at the Parties' request. *See Miller v. Sodexo Mgmt. Inc.*, No. 3:19-cv-01909 (S.D. Cal.); *Grano v. Andrew & Williamson Fresh Produce, Inc.*, No. 3:18-cv-01750-TWR-BLM (S.D. Cal.); *Baker v. Sodexo, Inc.*, No. 3:18-cv-01856-TWR-BLM (S.D. Cal.); and *Abbott v. Sodexo, Inc.*, No. 3:18-cv-01975-TWR-BLM (S.D. Cal.).

[6]     Grano's Fourth Amended Complaint asserts one count of strict liability and one count of negligence against both Sodexo and Cargill. ECF No. 312 at 25-29.

against Cargill on December 26, 2019, for breach of indemnification. ECF No. 62. Sodexo also filed a third-party complaint against US Foods on May 7, 2020, asserting one count of equitable indemnity and one count of contribution and apportionment. ECF No. 128 at 5-6.

Relevant to this Order, the Parties have filed nine motions:

1. Cargill and Sodexo's Motion in Limine to exclude a CDC Report and Case-Control Study, as well as any references to 9 C.F.R. § 417.3(b), ECF Nos. 337, 360;

2. Cargill's Motion in Limine exclude the Declaration of Dr. Amelia Keaton, the epidemiologist who led the CDC's investigation, ECF No. 379;

3. Cargill and Sodexo's Motion to Exclude the opinions and testimony of Plaintiffs' causation expert, Dr. Kirk Smith, ECF Nos. 338, 361;

4. Cargill and Sodexo's Motion to Exclude the opinions and testimony of Plaintiffs' microbiology and food safety systems expert, Scott Stillwell, Ph.D., ECF Nos. 339, 362;

5. Sodexo and Cargill's Joint Motion to Exclude testimony regarding causation from Plaintiffs' expert, Dr. Roberto Civitelli, and limit testimony regarding causation from Plaintiffs' expert, Dr. Michael Mont, ECF No. 346.

6. Cargill and Sodexo's Motion for Summary Judgment on Plaintiffs' strict-liability claim, negligence claim, and punitive damages, ECF Nos. 341, 363;

7. Third-Party Defendant US Foods' Motion for Summary Judgment on all of Sodexo's third-party claims, ECF No. 340;

8. Cargill's Motion for Summary Judgment on Sodexo's cross claims, or alternatively, for declaratory judgment, ECF No. 342; and

9. Sodexo's Motion for Partial Summary Judgment on Grano's claims for Punitive Damages, ECF No. 343.

The Court addresses all nine motions in this Order.

3:18-cv-1818-RSH-BLM

### III.   MOTIONS IN LIMINE

A party may move in limine to exclude inadmissible or excludable evidence or testimony before it is introduced at trial. *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). Motions in limine "should not be used to resolve factual disputes, weigh evidence, or as a substitute for a motion for summary judgment." *Lo v. United States*, No. 2:17-cv-01202, 2022 WL 1014902, at *2 (W.D. Wash. Apr. 5, 2022). Unless the evidence is "inadmissible on all potential grounds[,] . . . evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *BNSF Ry. Co. v. Quad City Testing Lab'y, Inc.*, No. 07-cv-170, 2010 WL 4337827, at *1 (D. Mont. Oct. 26, 2010) (quotation marks and citation omitted).

Rulings on motions in limine fall entirely within a court's discretion. *United States v. Bensimon*, 172 F.3d 1121, 1127 (9th Cir. 1999) (citing *Luce*, 469 U.S. at 41-42). "Any ruling on a motion in limine, however, is necessarily tentative in nature; a 'district court may change its ruling at trial because testimony may bring facts to the district court's attention that it did not anticipate at the time of its initial ruling.'" *McNally v. Riis*, No. 3:18-cv-1150, 2020 WL 209141, at *1 (S.D. Cal. Jan. 14, 2020) (quoting *Bensimon*, 172 F.3d at 1127). Denial of a motion in limine does not mean that the evidence contemplated by the motion will be admitted at trial. *Bensimon*, 172 F.3d at 1127 (recognizing that a trial court lacks access to all the facts from trial testimony when ruling on a motion in limine). Instead, denial means that the court cannot — or should not — determine if the evidence in question should be excluded before trial. *See McSherry v. City of Long Beach*, 423 F.3d 1015, 1022 (9th Cir. 2005) (holding that rulings on motions in limine are subject to change when trial unfolds).

Defendants move in limine to exclude three pieces of evidence: (A) the CDC's Report and Case-Control Study, (B) references to 9 C.F.R. § 417.3(b), and (C) the Declaration of Dr. Amelia Keaton. The Court denies all requests as explained below.

### A.    The CDC's Case-Control Study & Report

Cargill moves to exclude the CDC's investigation and Report, as well as any testimony and documents that rely on the CDC's work. ECF No. 337. Sodexo joins Cargill's Motion. ECF No. 360. The CDC's Report described a statistically significant association between cases of STEC and consumption of "any undercooked beef products," where "[t]he variable 'undercooked beef' includes any dishes containing ground beef (such as hamburgers) or other beef products (such as beef stew or Swiss steak)." ECF No. 337-2 at 12. "While the case-control study did identify a statically-significant association with undercooked beef and illness, a specific dish was not found to be associated with illness." *Id.* at 14. The Report noted that "[n]o individual beef dishes or other individual food exposures were significantly associated with case status." *Id.* at 12.

As explained below, the Court denies Defendants' Motion.

### 1.    *Admissibility of The Case-Control Study & Report*

Hearsay is generally not admissible. Fed. R. Evid. 802. However, one exception to the rule against hearsay is "[a] record or statement of a public office [that] sets out . . . in a civil case . . . factual findings from a legally authorized investigation" so long as "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8). "A party opposing the introduction of a public record bears the burden of coming forward with enough negative factors to persuade a court that a report should not be admitted." *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992) (citation omitted). According to the Advisory Committee notes to Federal Rule of Evidence 803(8), factors which "may" assist a court in determining if a report is admissible are: (1) the timeliness of the investigation, (2) the special skill or experience of the official, (3) whether a hearing was held and the level at which it was conducted, and (4) possible motivation problems. Fed. R. Evid. 803 advisory committee's note to 1972 amendment para. 8(c). "However, the court is not required to employ the test." *Salim v. Mitchell*, 268 F. Supp. 3d 1132, 1159 (E.D. Wash. 2017) (citing *Daniel v. Cook*

1    *Cnty.*, 833 F.3d 728, 741 (7th Cir. 2016) (observing the test comes from the advisory
2    committee notes and "is not the law of this court")).

3         Defendants argue that the neither the Epi-Aid Report nor the underlying Case-
4    Control Study fall within this exception to the rule against hearsay because the source of
5    information and other circumstances demonstrate untrustworthiness.[7] Specifically,
6    Defendants take issue the Epi-Aid Team's: (1) investigative delay; (2) investigative bias;
7    (3) case-control pairing; (4) interpretation; (5) preliminary report; and (6) reliance on
8    hearsay. The Court addresses each argument below.

                              i.    <u>Investigative Delay</u>

10        Defendants challenge the Epi-Aid Team's work as untrustworthy under Rule 803(8)
11   because the USMC did not contact the CDC until "over a month after the initial cases[,]"
12   the CDC did not administer questionnaires until six weeks after the outbreak started, and
13   some Marine recruits were not interviewed until two months after the outbreak. ECF No.
14   337 at 11, 13; ECF No. 383 at 8; *see* ECF No. 337-2 at 9. In the time before the CDC's
15   deployment, Defendants claim that "[m]emories of the recruits faded" and the USMC
16   "instituted multiple hygiene control measures" (e.g., increased access to hand sanitizer,
17   soap, and toilet paper; a temporary change from self-service to kitchen-service at all food
18   lines; and sanitization of various portions of the camps) that "impeded the ensuing
19   investigation into causation." ECF No. 337 at 13, 23-24.[8]

20        The CDC's Report admits to many of the shortcomings Defendants complain of in
21   its "Limitations" section:

---

[7]    The Parties do not contest that the CDC was authorized by law to conduct the investigation under 42 U.S.C. § 241(a).

[8]    It is unclear if Defendant Sodexo was responsible for instituting these changes. A November 3, 2017, email from Sodexo QC Health & Safety Coordinator Wendy Bueker notes "Sodexo is making sure hand sanitizer is available at all mess hall entrances . . . . Sodexo performed an initial TB disinfectant cleaning of Back of House (BOH), pot shack, and scullery walls, equipment and prep tables . . . ." ECF No. 337-2 at 374.

> At the time the Epi-Aid team arrived, one month had passed since the first case-patient reported symptoms. Although calendars and training schedules were used to remind recruits of their whereabouts at the time of the outbreak, it is possible that many recruits forgot key events and foods eaten during this time. This is especially true of recruits who served as controls in the case-control study, as they would not have had an illness that would prompt memories of the time period in question. . . . [M]any environmental and sanitation interventions were made at MCRD San Diego and MCRD Edson Range before the arrival of the Epi-Aid team. Such interventions likely limited the spread of the outbreak, but hindered the ability of the team to assess the training conditions present at the time of the outbreak.

ECF No. 337-2 at 13.

However, neither the one-to-two-month delay in surveying respondents nor any newly implemented hygiene control measures are fatal to the admissibility of the Case-Control Study here. Delay alone does not invalidate the trustworthiness of a survey. *See Fed. Trade Comm'n v. LendingClub Corp.*, No. 18-cv-02454, 2020 WL 2838827, at *15 (N.D. Cal. June 1, 2020) (declining to exclude survey results because of purported delay in surveying respondents); *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1062 (E.D. Wash. 2013) (finding "no evidence that the report [wa]s untimely" where investigation commenced over four months after the investigated events). Indeed, case-control studies "may be prospective, identifying patients and then following them for a period of time, or retrospective, identifying patients and then performing a medical chart review to determine what happened during the period they did or did not take the drug." *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1173 (N.D. Cal. 2007). Accordingly, some delay may be expected when performing a retroactive case-control study.

Furthermore, it is well accepted that "case-control studies are prone to recall bias" and other confounding variables. *Hardeman v. Monsanto Co.*, 997 F.3d 941, 963-64 (9th Cir. 2021) (internal quotation marks omitted) (rejecting arguments regarding "case-control studies that did not sufficiently account for confounding factors").[9] Nevertheless, courts regularly admit surveys despite possible recall bias. *See, e.g.*, *Oracle Am., Inc. v. Google Inc.*, No. 10-cv-03561, 2016 WL 1743116, at *8 (N.D. Cal. May 2, 2016) (admitting survey asking respondents to recall details over a two-year period); *Medlock v. Taco Bell Corp.*, No. 1:07-cv-01314, 2015 WL 8479320, at *5 (E.D. Cal. Dec. 9, 2015) (admitting survey asking respondents to recall information over an 11-year period). Recall bias is also less concerning where surveyors make efforts to improve recall accuracy by using memory aids — as the CDC did here. *See Senne v. Kan. City Royals Baseball Corp.*, No. 14-cv-00608, 2017 WL 897338, at *25 (N.D. Cal. Mar. 7, 2017) (finding "recall bias d[id] not warrant exclusion" of survey because surveyor used memory aids and "[t]here is a body of literature that shows that aided recall questions are an accepted technique for assisting in recall"). Therefore, Defendants' criticism of the design and methodology behind the Case-Control Study are not a basis for exclusion.

### ii.   Investigative Bias

Defendants contend that the Case-Control Study suffers from two investigative biases: (1) "the recruit questionnaire was biased and led to inaccurate data collection"; and (2) "[t]he structure and conduct of the CDC's investigation lays bare a bias toward finding a beef food source, to the exclusion of fresh produce." ECF No. 337 at 22-24. Neither argument warrants exclusion of the Case-Control Study.

---

[9]   "[R]ecall bias[] occurs where people with a disease . . . are differently able to recall past exposures than are people who never get sick; generally, the assumption is that the cases will recall greater levels of exposure, as those who become ill are more likely to ruminate about the possible causes of their disease." *Hardeman*, 997 F.3d at 964 n.14.

"Confounding variables are other factors that could explain an observed association between a substance and the disease." *Id.* at 964 n.15.

***First,*** Defendants claim that the CDC's survey questionnaires were flawed from their inception because the response options included "Yes," "No," "Maybe," and "Don't Know." Defendants argue "[e]pidemiologists would not use 'Maybe' and 'Don't Know' in the same survey because there is no analytical difference between these responses." ECF No. 337 at 32; *see* ECF No. 383 at 4 ("it is standard practice to include only a single third option, 'don't know.'").

Both the initial and supplemental CDC questionnaires offered respondents both "Maybe" and "Don't Know" answer options but did not define or distinguish between the two choices. *See* ECF No. 364-6; ECF No. 364-11. Indeed, Plaintiffs' expert, Kirk E. Smith, Ph.D., acknowledged his standard procedure is to use only "yes, no, don't know. . . . [b]ecause there isn't a huge difference between 'maybe' and 'don't know[.]'" ECF No. 337-2 at 394. Although the responses to the CDC's questionnaire are not ideal, "'technical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'" *Airhawk Int'l, LLC v. Ontel Prod. Corp.*, No. 3:18-cv-73, 2020 WL 10321726, at *6 (S.D. Cal. Jan. 2, 2020) (quoting *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)); *see, e.g.*, *Medlock*, 2015 WL 8479320, at *5 ("The Court finds that Defendants' criticisms of [the] wording of the questions goes to the weight of the evidence, and not the admissibility of the survey."). Therefore, Defendants' assertions of bias in the CDC's survey design are more appropriately resolved at trial. *Fed. Trade Comm'n*, 2020 WL 2838827, at *14 (declining to exclude survey results because experts disagreed on whether questionnaires should have used "yes/no/I don't know" responses or open-ended answers).

***Second,*** Defendants claim the Epi-Aid Team was biased toward the "perceived least complicated source to investigate" because "[t]he CDC understood that the produce suppliers, based out of the central coast of California and Yuma, Arizona, are repeat producers of STEC-contaminated produce" and "there was a leafy green outbreak, whose growing source was undetermined . . . overlapping the time of the recruit outbreak." ECF No. 383 at 8; ECF No. 337 at 24. According to Defendants, "the study indicated a closer

association between ill recruits and tossed salad than hamburgers." ECF No. 383 at 8. Despite this, Defendants assert that there was "a strong bias in the CDC's questionnaire, suggesting beef . . . as the likely source to the exclusion of other potential sources[,]" the CDC "only attempted to trace back ground beef patties[,]" and the CDC conducted "zero traceback . . . into any of the produce sources." ECF No. 337 at 24.

Defendants' assertion that "[t]he CDC understood that the produce suppliers, based out of the central coast of California and Yuma, Arizona, are repeat producers of STEC-contaminated produce" is wholly without support in the record. ECF No. 337 at 24. In lodging this allegation, Defendants refer to the deposition of *Plaintiffs'* expert who neither works for the CDC nor makes such a claim in his deposition. *See id.* (citing ECF No. 337-2 at 377). The CDC also completed whole genome sequencing on clinical isolates of the *E. coli* strains from both the recruit outbreak and the separate leafy green outbreak, which were subsequently uploaded to PulseNet, the national molecular subtyping network for foodborne disease and surveillance. *See* ECF No. 337-2 at 8-10, 12. Yet, Defendants provided no evidence that the CDC found the two outbreak strains were related.[10]

As this Court previously noted in its December 3, 2020, Order granting Plaintiffs' Leave to file an amended complaint, the Epi-Aid Report notes that the CDC acknowledged and investigated various factors that could cause a STEC outbreak, including leafy greens, contact with infected animals, exposure to contaminated water, and recruits' hygiene and environmental practices. ECF No. 252 at 11. In fact, Defendants attached to their *Daubert* Motion to exclude Plaintiffs' expert Dr. Smith an email sent on November 30, 2017 — contemporaneous to the Epi-Aid Team's investigation — from CDC Deputy Director Michael J. Beach, Ph.D., stating, "[t]he case-control study is focusing on several food items, including ground beef and fresh produce, and also include[s] questions on water and

---

[10]   The Court will not address Plaintiffs' cursory request to "prohibit Cargill from referencing the outbreak to the jury." ECF No. 364 at 17 n.13. Such a request is appropriately raised in a motion, not a response brief. *See* Fed. R. Civ. P. 7(b).

1  animal exposure." ECF No. 338-2 at 77. The Affidavit of U.S. Navy Captain and
2  preventive medicine officer, Dr. Jennifer Espiritu, M.P.H., expounds upon these efforts and
3  why certain potential sources were not investigated further. *See* ECF No. 364-5.
4  Specifically, Dr. Espiritu observed that not only did Sodexo employees rinse and wash the
5  leafy green vegetables used for salads, but also all salads "were prepared in the same
6  manner, meaning all non-recruit personnel would have consumed lettuce from the same
7  production batches as recruits." *Id.* at 8. Nevertheless, "[n]o officers or drill instructors
8  were found to have confirmed STEC infection during" the outbreak. ECF No. 364-4 at 2.

9       Finally, Defendants' contention that the Epi-Aid Team only conducted a traceback
10  analysis on beef despite tossed salad having a closer association with ill recruits is flawed.
11  Defendants selectively point to the Case-Control Study's findings regarding hamburgers
12  while completely ignoring that the observed associations for "cheeseburgers," "any beef
13  products," "any ground beef products," and "any undercooked beef products" are all
14  markedly greater than the observed association for "tossed salad." ECF No. 337-2 at 25.[11]

15      Because the CDC did not demonstrate investigative bias, the Court finds no reason
16  to exclude the Case-Control Study.

17                    iii.   Case-Control Pairing

18      Defendants advance four challenges to the Epi-Aid Team's use of controls in the
19  Case-Control Study: (1) the CDC did not achieve its planned ratio of cases and controls;
20  (2) the CDC used different criteria to select controls than it did to identify cases; (3) the
21  CDC did not account for certain cases; and (4) the CDC matched cases and controls with
22  nearly identical exposures. None of these challenges prevail.[12]

---

25  [11]    Among other variables, the Case-Control Study reported results for "hamburgers,"
26  "cheeseburgers," and "any burgers." ECF No. 337-2 at 25.
   [12]    In their reply brief supporting an entirely separate motion, Defendants ask to exclude
27  the Affidavit of Dr. Kirk Smith. *See* ECF No. 388 at 11. A motion is the proper vehicle for
   such a request. *See* Fed. R. Civ. P. 7(b). Nevertheless, the Court denies this request as moot
28  because the Court does not rely on the Affidavit.

***First,*** Defendants contend that the CDC "failed to adjust its formulas when it was unable to achieve its originally contemplated ratio of cases to control recruits" and "enroll[ed] only 45 cases and 90 controls." ECF No. 337 at 22, 30.

However, the Epi-Aid Team "attempted to recruit three controls for each case." ECF No. 337-2 at 9. Exhibits attached to Defendants' Motion in fact confirm that the CDC achieved their planned case-control ratio by enrolling 43 cases and 129 controls. *Id.* at 25.[13]

***Second,*** Defendants claim that "the Study required controls to be diarrhea-free between October 1 and 31, 2017, but cases were considered over the time period October 9 through December 15, 2017." ECF No. 337 at 30. Defendants argue that "[t]his mismatch in time periods makes it impossible to match cases who became ill after October 31 with a diarrhea-free control post-October 31." *Id.*

Defendants correctly note that the Epi-Aid Team identified cases as recruits with laboratory evidence, physician diagnosis, or symptoms occurring "between October 9, 2017, and December 15, 2017." ECF No. 337-2 at 8. However, the Epi-Aid Team also defined a control as a recruit "in the same platoon and company" who did not develop symptoms "between October 1, 2017–October 31, 2017." *Id.* The Report does not explain why the CDC used differing time periods for cases versus controls. But these date ranges are a distinction without a difference because the criteria for cases and controls are mutually exclusive. If a control developed symptoms after October 31, 2017, they would necessarily be identified as a "case" because a case included recruits who developed symptoms "between October 9, 2017, and December 15, 2017." *Id.*

***Third,*** Defendants argue that the Case-Control Study incorrectly "indicates the first case was October 17, 2017" even though the raw study data shows "the first known case was at least October 14, 2017." ECF No. 383 at 9.

---

[13]   This is one of several instances throughout the briefing where Defendants seemingly refer to facts that are not in the documents attached to their Motion, cite page numbers that do not exist, or exhibits that were not attached to their Motion.

The Report does state that "[s]ymptom onset dates for recruits with information available ranged from October 17, 2017-November 19, 2017." ECF No. 337-2 at 10. The raw data also indicates that survey respondent "21" reported an onset date of "10/14/2021." *Id.* at 70. Yet, the Report does not mention a case with a symptom onset date of October 14, 2021. Nevertheless, issues related to miscoding of survey results go to weight, not admissibility. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292-93 (9th Cir. 1992) (finding that criticisms regarding suggestive questions and miscoding of survey responses goes to the weight, not the admissibility, of survey evidence).

*Fourth,* Defendants argue that "the Epi-Aid team paired cases to controls in the same platoon or company, obscuring nearly all potential sources, as recruits in the same unit had nearly identical exposures." ECF No. 337 at 22. As a result, "this limitation largely blinded investigators to statistically significant differences in exposures shared by both cases and controls . . . ." *Id.* at 29.

When conducting a case-control study, "[i]f possible, cases and controls should be drawn from the same underlying population at risk of the health outcome so that fair comparisons can be made." 3 David L. Faigman et al., *Mod. Sci. Ev.* § 23:37 (2021). As such, the CDC's Case-Control Study defined a "control" as a "Marine Corps recruit in the same platoon and company as a confirmed case but who did not develop diarrhea . . . ." ECF No. 337-2 at 9. The Report also acknowledged "[w]hile training exposures varied by company, recruits within the same company should have been exposed to the same training experiences and conditions at the same time. This structure made it difficult to detect a statistically significant difference in exposures between cases and controls." *Id.* at 13. However, U.S. Navy Captain and preventive medicine officer Dr. Espiritu explained the rationale behind this matching scheme:

> The reason for this is that, by the time we began administering the case control questionnaires, with which I was personally involved, exposure to a contaminated food item was the most plausible point source for this outbreak, based on our

> investigative findings to date. We understood at the time that this
> could obscure environmental exposures, since cases and controls
> in the same platoon would have had the same environmental
> exposures, but because an environmental exposure appeared far
> less likely to have been the point source than a food exposure,
> this construct would allow us to engineer more sensitivity into
> the study for food-related exposures. Based on my knowledge
> and experience, this was a sound epidemiologic decision, and
> was one that CDC officials . . . fully supported.

ECF No. 364-5 at 7.

Although the Parties may have dueling case-control matching methodologies, "these criticisms arguably bear more on the [study]'s persuasiveness, not its admissibility." *P & P Imp. LLC v. Johnson Enter., LLC*, 46 F.4th 953, 964 (9th Cir. 2022); *see, e.g.*, *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. 10-cv-544, 2011 WL 5417090, at *5 (N.D. Cal. Oct. 27, 2011) (finding arguments that a survey failed to address the correct universe, failed to use a sample of a representative population, and failed to use a control group affected only the weight and not the admissibility of the survey).

### iv.   Interpretation

Defendants mount four attacks on the Epi-Aid Team's interpretation of the Case-Control Study results. Specifically, Defendants claim that the CDC: (1) used a flawed methodology for coding survey responses; (2) selectively and misleadingly reported the variables measured by the survey; (3) relied on statistically insignificant p-values; and (4) drew conclusions from statistically insignificant odds ratios. All four arguments fail to justify exclusion of the Case-Control Study.

#### a.   *Survey Response Coding*

First, Defendants assert that "the Epi-Aid team interpreted the recruit questionnaire responses in a misleading manner (i.e., counting a "Maybe" response as a "Yes" and a "Don't Know" as a "No") that was not disclosed in the Report." ECF No. 337 at 23.

In addition to "Yes" and "No" responses, both the initial and supplemental CDC questionnaires provided respondents with "Maybe" and "Don't Know" answer options, but no definition distinguishing the latter two choices. *See* ECF No. 364-6; ECF No. 364-11. Although the Report does not mention it, the underlying raw survey data indicates that the Epi-Aid Team treated "Maybe" responses as "Yes" and "Don't Know" responses as "No." *Compare* ECF No. 337-2 at 25 (reporting a total of 10 recruits ate hamburgers), *with* ECF No. 337-2 at 73 (recording 6 "Yes" responses, 27 "No" responses, 4 "Maybe" responses, 1 "Don't Know" response, and 4 blanks). While Defendants' expert may disagree with the decision to code "Maybe" responses as "Yes" and "Don't Know" responses as "No," the CDC's methodology is not fatal to the admissibility of the survey. *See In re Elysium Health-ChromaDex Litig.*, No. 17-cv-7394, 2022 WL 421135, at *6 (S.D.N.Y. Feb. 11, 2022) (admitting survey with question responses for "Yes," "No," "No Opinion," and "Don't Know/Unsure").

However, the Court notes that the CDC may not have even adhered to this coding regime either. In some instances, the CDC reported totals that contradict the underlying survey data without explanation. *Compare* ECF No. 337-2 at 25 (reporting a total of 27 recruits ate carrots), *with* ECF No. 337-2 at 76 (recording 23 "Yes" responses, 13 "No" responses, 3 "Maybe" responses, 1 "Don't Know" response, and 2 blanks); *compare* ECF No. 337-2 at 25 (reporting a total of 25 recruits ate spinach), *with* ECF No. 337-2 at 75 (recording 22 "Yes" responses, 15 "No" responses, 2 "Maybe" responses, 1 "Don't Know" response, and 2 blanks). Experts may disagree on analytical methods like counting "Maybe" responses as "Yes," but there is little room to disagree on what appear to be outright miscoding of survey responses. Nonetheless, the miscoding appears to be limited to a few responses in a small number of variables.

To be sure, "[s]cientific studies almost invariably contain flaws." *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 289 F. Supp. 2d 1230, 1240 (W.D. Wash. 2003) (citing *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 1997 WL 230818, at *8-9 (E.D. Pa. May 5, 1997) ("[T]here is no such thing as a perfect

epidemiological study.")). "When faced with epidemiological evidence, the court must determine whether the flaws compromise the study's findings." *In re Phenylpropanolamine*, 289 F. Supp. 2d at 1240. "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002). "Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice." *Id.* (citing *Fireman's Fund Ins. Co. v. Alaskan Pride P'ship*, 106 F.3d 1465, 1468 (9th Cir. 1997); and then *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)). "In some cases, however, the analysis may be 'so incomplete as to be inadmissible as irrelevant.'" *Hemmings*, 285 F.3d at 1188 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (Brennan, J., concurring in part)). Nevertheless, "if there is proper foundation for its admission, including that it was conducted according to accepted scientific principles, and it is relevant to the issues to be decided at trial, a survey can be admitted." *Jimenez v. Allstate Ins. Co.*, No. LA-cv-1008486, 2019 WL 13088814, at *15 (C.D. Cal. May 13, 2019) (citing *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001)); *see Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1025 (C.D. Cal. 2018) ("The admissibility threshold for survey evidence in the Ninth Circuit is notably low.").

While the possible miscoding is prime territory for cross examination of the Case-Control Study's findings, "issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility." *Clicks Billiards*, 251 F.3d at 1263. Given the availability of the underlying raw survey data, the Parties are on equal footing. Plaintiffs are free to present evidence to the jury explaining the CDC's coding methodology and possible miscoding, as well as any resulting changes to the CDC's findings. By the same token, Defendants may present evidence to the jury undermining the CDC's coding methodology and highlighting the possible miscoding, as well as any resulting changes to

the CDC's findings. The jury will then decide how much weight to afford the Case-Control Study. *See E. & J. Gallo Winery*, 967 F.2d at 1292-93 ("Joseph claims that the survey's questions relating to confusion were slanted and that the interviewees' responses were coded improperly. . . . As noted above, it is routine to admit a relevant survey; any technical unreliability goes to weight, not admissibility.").

### b.    Variables Reported

Second, Defendants accuse the CDC of selectively reporting the results of the Case-Control Study by including in the Report only 13 of the 64 variables recorded in the surveys and only 5 of the 27 follow-up questions. ECF No. 337 at 30-31.

In addition to the narrative of findings, the Report includes seven tables displaying analysis of at least 22 variables across the categories of food and drinks, hygiene, training, and the respondent's health. *See* ECF No. 337-2 at 16-27. The reported results include the variables that Defendants allege could have otherwise contributed to the outbreak such as produce and hygiene. *Id.* If Defendants believe the CDC should have reported more results from the survey, Defendants have the underlying raw survey data and may draw out the findings they deem favorable at trial. *See Clicks Billiards*, 251 F.3d at 1265 (holding critiques of a survey's conclusions go to weight rather than admissibility).

### c.    P-values

Third, Defendants claim "[t]he p-value for hamburgers found in the Study was 1. A p-value of 1 is as far away as statistically possible from an association." ECF No. 337 at 31.[14] Thus, Defendants argue the Case-Control Study should be excluded as a matter of

---

[14]    "The P-value measures the likelihood that one would see the observed association even in the absence of a true association. The lower the P-value, the less likely the observed result is due to chance alone. In other words, as the P-value gets smaller and smaller, the data is less and less consistent with the 'null hypothesis': the hypothesis that there is no association between the factor and the outcome. Traditionally, P-values are termed 'statistically significant' when they are less than 5 percent ($P < 0.05$) and confidence intervals (or 'level of confidence') are set at 95%." *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 592 (D.N.J. 2002).

law because of "the statistically-insignificant p-value of 1 for burgers[.]" ECF No. 383 at 3-4.

"[T]he p-value for a given study does not provide a rate of error or even a probability of error for an epidemiologic study." Nat. Acad. of Sci., *Reference Manual on Sci. Evid.* 575 (3d 2011); *see* 1 David H. Kaye et al., *Mod. Sci. Evidence* § 5:36 (2021) ("[I]t is easy to mistake the p-value for the probability that there is no difference.). Indeed, there is no mandatory p-value required for a study, especially in the field of epidemiology. *See In re Tylenol (Acetaminophen) Mktg., Sales Pracs., & Prod. Liab. Litig.*, 198 F. Supp. 3d 446, 456 (E.D. Pa. 2016) ("there is no requirement in the causation algorithm that there be an epidemiologic study that would demonstrate a statistically significant 2.0 relative risk to a P-value of .05 standard epidemiologic association in order to rule in a drug as a potential cause"); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1102 (D. Colo. 2006) ("the corresponding move by some in this field away from using p-values and 'statistical significance' as a means of determining what conclusions and inferences can be reliably drawn from an epidemiological study, has been recognized by the courts"); *see also Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005) ("As a general matter, so long as the evidence is relevant and the methods employed are sound, neither the usefulness nor the strength of statistical proof determines admissibility under Rule 702."); *Magistrini*, 180 F. Supp. 2d at 592 ("A confidence interval provides more information for evaluating an epidemiology study than a P-value.").[15] Hence, the Court finds no basis to exclude the Case-Control Study because of its calculated p-values.

---

[15]    Defendants claim *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 877 (W.D. Tex. 1997), supports exclusion of a study based on its p-values because the *Kelley* court "exclud[ed] an expert under Rule 703 for relying on an epidemiological study with a 'lower-end confidence interval[] less than one[.]'" ECF No. 383 at 4. Therefore, the p-value of 1.00 for "any burgers" warrants exclusion of the Case-Control Study. *Id.* As the language Defendants quote in their brief makes clear, *Kelley* excluded an epidemiological study because the confidence interval (not p-value) for its key finding fell below 1.00. However, Defendants are well-aware that "any burgers" was only one of several variables

1

2          *d.      Odds Ratios*

3          Fourth, Defendants contend that "[t]he odds ratio for consuming 'any burgers' was

4  1.0. Odds ratios this low are not probative of causation or helpful to the jury." ECF No.

5  383 at 5. Therefore, Defendants ask the Court to exclude the Case-Control Study because

   the "calculated odds ratio does not show an association to burgers." *Id.* at 5.

6          "Case-control studies report an odds ratio as the measure of association between the

7  variables the investigators are studying." *In re Bextra*, 524 F. Supp. 2d at 1117. "In a case-

8  control study, the odds ratio is the ratio of the odds that a case (one with the disease) was

9  exposed to the odds that a control (one without the disease) was exposed." *Id.* "An odds

10 ratio greater than 1.0 indicates an association, as it suggests those with the disease are more

11 likely to have been exposed to the substance of interest." *Id.*

12         "Odds ratios are typically reported with confidence intervals that seek to capture the

13 likely effects of random error." *Id.* "A 95% confidence interval, the standard interval, is a

14 range that would capture the actual odds ratio 95% of the time if the study were conducted

15 repeatedly." *Id.* "Generally, larger sample sizes produce narrower confidence intervals."

16 *Id.* "When the lower bound of the 95% confidence interval exceeds 1.0, the results of the

17 study are considered to show an association that is 'statistically significant' at the .05

18 level." *Id.* "The purpose of assessing statistical significance is to determine how likely it is

19 that an observed odds ratio is merely due to chance, rather than indicative of a true

20 association." *Id.* "The line delineating what constitutes a statistically significant result is

21 necessarily somewhat arbitrary, and the experts dispute how much weight to give studies

22

23

24 measured in the Case-Control Study — including "any undercooked beef products" which
   resulted in a confidence interval above 1.00. *See* ECF No. 337-2 at 25.

25         The other cases Defendants cite are also inapplicable. *See In re Nexium*
   *Esomeprazole*, 662 F. App'x 528, 530 (9th Cir. 2016) (affirming exclusion of expert who
26 inferred a causal relationship based on a review of 13 references despite that many of the
27 reviewed studies came to a different conclusion); *In re High-Tech Emp. Antitrust Litig.*,
   No. 11-cv-02509, 2014 WL 1351040, at *7 (N.D. Cal. Apr. 4, 2014) (regarding anti-
28 solicitation agreements, not epidemiology).

reporting odds ratios above 1.0 that are not statistically significant at the .05 level." *Id.* "Although there may be a causal association even in the absence of statistically significant results, statistical significance remains a useful metric for determining whether the results of a given study likely show a real association." *Id.* (citing *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 793 (3d Cir. 2017)).[16]

Here, the "any burgers" variable that Defendants complain of was not the basis for any causal findings in the Case-Control Study — likely because the CDC concluded that the odds ratio of 1.00 was not conclusive of any association. Instead, the Report discusses other findings, such as the 2.40 odds ratio for "any undercooked beef." *See* ECF No. 337-2 at 12. Even then, the Report disclaims: "The Epi-Aid team was unable to definitively link any exposure to illness during this outbreak. While the case-control study did identify a

---

[16]     The Court in *In re Zoloft* articulated the importance of statistical significance as follows:

> Central to this case is the question of whether statistical significance is necessary to prove causality. We decline to state a bright-line rule. . . . A causal connection may exist despite the lack of significant findings, due to issues such as random misclassification or insufficient power. Conversely, a causal connection may not exist despite the presence of significant findings. If a causal connection does not actually exist, significant findings can still occur due to, inter alia, inability to control for a confounding effect or detection bias. A standard based on replication of statistically significant findings obscures the essential issue: a causal connection. Given this, the requisite proof necessary to establish causation will vary greatly case by case. This is not to suggest, however, that statistical significance is irrelevant. Despite the problems with treating statistical significance as a magic criterion, it remains an important metric to distinguish between results supporting a true association and those resulting from mere chance. Discussions of statistical significance should thus not understate or overstate its importance.

858 F.3d at 793 (footnotes omitted).

statically-significant association with undercooked beef and illness, a specific dish was not found to be associated with illness." ECF No. 337-2 at 14; *see id.* at 12 ("No individual beef dishes or other individual food exposures were significantly associated with case status."). The fact that the Case-Control Study found no statistically significant association for one of many measured variables does not justify outright exclusion of the study in its entirety. *See Stone v. Advance Am.*, 278 F.R.D. 562, 568 (S.D. Cal. 2011) ("At trial, Defendants will be able to cross examine Krosnick and present their own expert witness to highlight any weaknesses in the potential rate of error.").

v.   Preliminary Report

Defendants argue the Report is excludable under Ninth Circuit precedent because the CDC's Report "states, on its first page," that it is "preliminary" and is not published like other CDC reports. ECF No. 337 at 17-19; *see* ECF No. 383 at 6-7.

The Court finds no reason to exclude the Report. The Report is dated January 23, 2018; bears the header of the CDC; and does not indicate that it is preliminary "on its first page." The only mention of "preliminary" is the Report's subtitle for its "Preliminary Recommendations" concerning medical staff, food, and hygiene. ECF No. 337-2 at 14-15. Even if the Report was preliminary, it would not necessarily render the Report unreliable.[17] *See Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1125 (9th Cir. 1994) (affirming trial court's admission of expert testimony "based on medical records, his clinical experience, preliminary results of an epidemiological study and medical literature."); *Andrews v. Plains All Am. Pipeline, L.P.*, No. CV-154113, 2021 WL 8742741, at *1, 4-5 (C.D. Cal. Nov. 10,

---

[17] The nonbinding cases Defendants cite are inapposite. *See Toole v. McClintock*, 999 F.2d 1430, 1433-34 (11th Cir. 1993) (finding district court erred in admitting FDA proposed rule report which contained no findings about the specific product at issue in the case and invited public comment); *In re Cessna 208 Series Aircraft Prod. Liab. Litig.*, No. 05-MD-1721, 2009 WL 2780223, at *3 (D. Kan. Sept. 1, 2009) (excluding airworthiness concern sheet noting the FAA was considering mandating certain changes to procedures and invited manufacturers to comment).

1  2021) (denying motion in limine to exclude the preliminary reports of three experts).

2  Likewise, the publication of the Report (or lack thereof) does not bear on its admissibility.

3  Federal Rule of Evidence 803(8) "does not require the document to be publicly reported to

4  constitute a 'public record' under the hearsay exception." *Heath v. Tristar Prod., Inc.*, No.

5  2:17-cv-2869, 2021 WL 3082564, at *7 (D. Nev. July 21, 2021). Indeed, Rule 803 sets out

6  the suggested criteria for evaluating trustworthiness of a public record and publication is

7  not one of them.

8                           vi.    Reliance On Hearsay

9          Defendants contend the Report "should be excluded due to its extensive reliance on

10  embedded hearsay." ECF No. 337 at 19.

11         To develop the Case-Control Study and Report, the CDC relied on surveys of

12  recruits, interviews, site visits, documents, medical reports, and laboratory testing. *See* ECF

13  No. 337-2 at 8-9. The Report does not contain individual survey responses, quotations, or

14  narratives from recruits. *See id.* Absent such extensive embedded hearsay, the Ninth Circuit

15  has held that survey evidence does not constitute hearsay and "should be admitted as long

16  as [it is] conducted according to accepted principles and [is] relevant." *Fortune Dynamic,*

17  *Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010);

18  *see, e.g.*, *Keith*, 858 F.2d at 481-82 (admitting under Rule 803(8) a summary of forms

19  completed by Caltrans agents supplemented by information obtained through personal

20  interviews or telephone calls); *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*,

21  694 F.2d 1150, 1156 (9th Cir. 1982) ("Surveys are admissible, if relevant, either as

22  nonhearsay or through a hearsay exception.").[18] The Court finds no reason to depart from

23  precedent here.

---

18        The cases Defendants reference are unanalogous to this case. *See United States v.*
*Pazsint*, 703 F.2d 420, 425 (9th Cir. 1983) (holding trial court erred in admitting recordings
of emergency calls as records of regularly conducted business activity under Rule 803(6));
*John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632, 636 (3d Cir. 1977) (affirming
district court's exclusion of 30 individual accident reports submitted to the National

After considering Defendants' arguments concerning investigative delay, investigative bias, case-control pairing, interpretation of findings, the alleged preliminary nature of the Report, and the CDC's reliance on hearsay, the Court is not persuaded that Defendants have carried their burden of demonstrating untrustworthiness. The Court finds that the Case-Control Study and Report fall within the public records exception to the rule against hearsay under Federal Rule of Evidence 803(8). *See Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012, 1027 (E.D. Cal. 2011) ("'the absence of definitive scientific studies' should not 'deprive a jury of having before it scientific opinions,' though 'less definitive and more qualified.'" (quoting *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1109 (D. Or. 2010))). "Effective cross-examination will nevertheless expose the weaknesses of a survey and tenuous conclusions drawn from those results." *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 905 (N.D. Cal. 2016).

### 2. The Probative Value of The Case-Control Study & The Report

If the Report and Case-Control Study are not excluded as hearsay, Defendants argue that they should be excluded under Federal Rule of Evidence 403 because the danger of unfair prejudice substantially outweighs the probative value. ECF No. 337 at 25.

---

Transportation Safety Board by pilots, government investigators, and witnesses of an accident); *Olender v. United States*, 210 F.2d 795, 799-02 (9th Cir. 1954) (finding file from county's public welfare department should have been excluded as hearsay because it contained an affidavit from a relative and five reports from banks); *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1062 (E.D. Wash. 2013) (admitting Department of Labor report as public record but disregarding "series of narratives" attributed to individuals other than plaintiffs); *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 744 (N.D. Cal. 2011) (excluding a "contact report" from a state agency that repeated statements from two phone calls with an attorney and an unnamed individual); *Wetherill v. Univ. of Chi.*, 518 F. Supp. 1387, 1390 (N.D. Ill. 1981) (excluding federal agency's report because the authoring "task force never undertook or intended to undertake a factual investigation[,]" included personal opinions in the report, relied on informal sources of evidence available only to the task force, conducted informal polls, considered substantial unpublished material that was not part of the public record, examined evidence by admitted non-experts, and staffed consultants who were actively involved in related litigation).

Specifically, Defendants contend that "[t]he equivocal nature of the Report's conclusions, based on the defective Study, when weighed against the sense of authority imparted by the CDC, generates unfair prejudice to Cargill and confusion for the jury." *Id.* at 25. Defendants further assert that "[t]his is especially true today, when in light of the recent global pandemic, the CDC has been center-stage in our country." *Id.* at 26.

Under Federal Rule of Evidence 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." However, "[r]elevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. . . . [T]he use of Rule 403 must be cautious and sparing." *Chopourian v. Cath. Healthcare W.*, No. CIV. S-09-2972, 2011 WL 6396500, at *2 (E.D. Cal. Dec. 20, 2011) (quoting *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000)). The Rule 403 balancing inquiry is made on a case-by-case basis, requiring an examination of the surrounding facts, circumstances, and issues. *United States v. Lloyd*, 807 F.3d 1128, 1152 (9th Cir. 2015). "In making a determination under Rule 403, the balance in close cases is struck in favor of admission" of the evidence. *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996) (quoting *United States v. Payne*, 805 F.2d 1062, 1066 (D.C. Cir. 1986)).

The Case-Control Study and Report are sufficiently tempered to avoid unduly prejudicing the jury. The Report never names the Defendants. Instead, the Report unequivocally states that "[t]he Epi-Aid team was unable to definitively link any exposure to illness during the outbreak." ECF No. 337-2 at 14. The Report qualifies that "[n]o individual beef dishes or other individual food exposures were significantly associated with case status." *Id.* at 12. And an entire section of the Report is dedicated to the limitations of the Case-Control Study. *See id.* at 13. Together, these measures ensure that Defendants are not unduly prejudiced. Indeed, the fact that the Case-Control Study and Report did not identify Defendants as the cause of the outbreak may even be of benefit to their defense.

*See Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244, 2022 WL 3974752, at *4 (N.D. Cal. Aug. 31, 2022) (declining to exclude evidence from a federal agency as prejudicial because case law that excluded evidence from federal agencies as prejudicial did so when the agencies made determinations regarding one of the specific parties in the litigation). As such, "a jury should be able to determine whether [the] asserted technical deficiencies undermine [the] survey's probative value." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997).

Additionally, Defendants are no more prejudiced here than in any other case involving a report by a federal agency. The CDC's authority is as influential here as the Federal Aviation Administration is to jurors who have flown in a plane, as the Department of Veterans Affairs is to jurors who served in the military, or as the Department of Education is to jurors who attended public school. Courts have squarely rejected Defendants' argument when advanced by litigants toward other agencies. *See Coates v. AC & S, Inc.*, 844 F. Supp. 1126, 1134 (E.D. La. 1994) ("[A]s to the defendant's argument to the effect that OSHA and EPA records bear the imprimatur of the government and thus, will impermissibly/unduly influence the jury, this Court simply disagrees."); *Wolf by Wolf v. Procter & Gamble Co.*, 555 F. Supp. 613, 625 (D.N.J. 1982) (finding CDC case-control study report admissible despite arguments of untrustworthiness under Rule 803(8) and prejudice under Rule 403). This Court rejects that logic here too. The probative value of the Report outweighs any prejudice to Defendants here.

### 3.     *Authentication of The Report*

Next, Defendants argue that the Report should be excluded because it is in non-final form and cannot be authenticated under Federal Rule of Evidence 901. ECF No. 337 at 28.[19]

---

[19]     Defendants do not dispute that the CDC authored the Report or contend that the version of the Report before the Court was altered in some way.

"Authentication is a 'condition precedent to admissibility[]' . . . ." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). "An inquiry into authenticity concerns the genuineness of an item of evidence, not its admissibility." *Bishop v. Harrington*, No. 1:11-cv-94, 2016 WL 3448078, at *10 (E.D. Cal. June 22, 2016). "Documents may be authenticated through personal knowledge where they are attached to an affidavit and the affiant is a competent witness who wrote the document, signed it, used it, or saw others do so." *Id.* "Courts generally view objections based on authentication skeptically in the absence of an indication that the document's authenticity is genuinely in dispute . . . ." *Id.* (citing *Chamberlain v. Les Schwab Tire Ctr. of Cal., Inc.*, No. 2:11-cv-03105, 2012 WL 6020103, at *2 (E.D. Cal. Dec. 3, 2012)). "When public records are presumed authentic and trustworthy, the burden of establishing a basis for exclusion falls on the opponent of the evidence." *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992).

Although the Report itself does not contain an embedded signature and only includes the CDC's symbol, the accompanying Declaration of Dr. Keaton states, "I personally co-authored the Epi-Aid Trip Report . . . . [which] was based upon my own personal knowledge and observations . . . ." ECF No. 364-3 at 1. "Under Federal Rule of Evidence 901, evidence that a public record or report is from the public office where items of that nature are kept satisfies the requirement that admitted evidence be authenticated." *Johnson v. Cate*, No. 1:10-cv-803, 2015 WL 5321784, at *9 (E.D. Cal. Sept. 10, 2015). Courts in the Ninth Circuit have found declarations similar to Dr. Keaton's sufficient to meet the standard for authentication under Rule 901. *See, e.g.*, *Horne v. Rutledge*, No. 08-cv-1387, 2009 WL 10700920, at *3 (N.D. Cal. Sept. 30, 2009) (considering on summary judgment policy authenticated by declaration of a government employee of the corresponding state agency); *Est. of Torres v. Terhune*, No. S982211, 2002 WL 32107987, at *1 (E.D. Cal. Jan. 9, 2002) (denying motion to strike declarations from government employees of state agency authenticating the state agency's policies attached to a motion for summary judgment, despite a party's objection that they had not had the opportunity to cross-

examine the employees). Therefore, Defendants' challenge to the authenticity of the Report fails.[20]

## B.     The Declaration of Dr. Amelia Keaton

Defendants separately move under Federal Rules of Evidence 403 and 802 to exclude the declaration of the CDC's Dr. Amelia Keaton [ECF No. 364-2] from use at trial or summary judgment because it "is inadmissible hearsay from a witness that will not testify at trial or be cross-examined at deposition." ECF No. 379 at 7. However, the Court denies Defendants' request as moot because the Court does not rely on the declaration to resolve the Parties' motions.[21]

## C.     References to 9 C.F.R. § 417.3(b)

Defendants move in limine to exclude any references to 9 C.F.R. § 417.3(b) as irrelevant and prejudicial under Federal Rules of Evidence 402 and 403. ECF No. 337 at 35-38. According to Defendants, it is Section 417.3(a) that is "applicable to pathogenic *E. coli* at North Butler, and testimony or evidence related to § 417.3(b) is irrelevant . . . ." ECF No. 337 at 36 (emphasis added).

Under regulations promulgated by the U.S. Department of Agriculture's Food Safety and Inspection Service ("FSIS"), beef producing facilities are required to "conduct, or have conducted for it, a hazard analysis to determine the food safety hazards reasonably likely to occur in the production process and identify the preventive measures the establishment

---

[20]     While the Court finds that the Report may be authenticated under Federal Rule of Evidence 901(b)(7), the Report could also be self-authenticating under Rule 902(4)(A). *See Johnson*, 2015 WL 5321784, at *10 ("Rule 902 allows for the self-authentication of certain documents, including official publications: 'Books, pamphlets, or other publications purporting to be issued by public authority.'" (quoting Fed. R. Evid. 902(5))).

[21]     The Court denies as premature Defendants' request to exclude Dr. Keaton's Declaration at trial. There is currently no indication that Plaintiffs intend to introduce the Declaration at trial.

can apply to control those hazards." 9 C.F.R. § 417.2(a)(1).[22] Based on this hazard analysis, "[e]very establishment shall develop and implement a written [Hazard Analysis and Critical Control Point Plan ("HACCP")] plan covering each product produced by that establishment whenever a hazard analysis reveals one or more food safety hazards that are reasonably likely to occur . . . ." *Id.* § 417.2(b)(1). "The HACCP plan shall describe the corrective action to be taken, and assign responsibility for taking corrective action . . . ." *Id.* § 417.3(a). However, "[i]f a deviation not covered by a specified corrective action occurs, or if another unforeseen hazard arises, the establishment shall . . . [p]erform or obtain reassessment . . . to determine whether the newly identified deviation or other unforeseen hazard should be incorporated into the HACCP plan." *Id.* § 417.3(b).

Plaintiffs assert that Section 417.3(b) is relevant, but Cargill has developed a paradoxical HACCP plan designed to skirt compliance with the regulation. ECF No. 364 at 25-29. Plaintiffs argue that Section 417.3(b) requires beef producing facilities to reassess their HACCP plan if: (1) an unforeseen hazard arises, or (2) a deviation occurs that is not already covered by a specified corrective action in the facility's HACCP plan. ECF No. 364 at 27. Plaintiffs claim that Cargill first made a "faulty hazard determination that STEC is not reasonably likely to occur at the point at which the Butler facility receives trim." *Id.* However, at the same time, Plaintiffs contend that Cargill's HACCP plan requires testing of a sample of finished product (i.e., a single beef patty comprised of ground trim from multiple suppliers every 15 minutes of production). *Id.* at 25-27; *see* ECF No. 356 at 13-14. If a patty tests positive for STEC, Cargill's HACCP plan calls for a corrective action of disposing of the individual patty that tested positive for STEC and, for suppliers with a

---

[22]  "The hazard analysis shall include food safety hazards that can occur before, during, and after entry into the establishment. A food safety hazard that is reasonably likely to occur is one for which a prudent establishment would establish controls because it historically has occurred, or because there is a reasonable possibility that it will occur in the particular type of product being processed, in the absence of those controls." 9 C.F.R. § 417.2.

pattern of positive tests, a series of discretionary notices requiring the supplier to complete a review of their STEC control program. ECF No. 364 at 25-27; *see* ECF No. 356 at 10. Plaintiffs argue that Cargill's system is paradoxical because it both determines that STEC is an unforeseeable hazard upon receiving trim from suppliers but also includes a corrective action for STEC positive tests for the same trim once it has been combined into a finish product. ECF No. 364 at 28-29; *see* ECF No. 356 at 21-22. Plaintiffs conclude that this paradox is an intentional scheme to circumvent the requirements of Section 417.3(b). ECF No. 364 at 29.

Defendants respond that "[a] hazard can be foreseen and nevertheless be [not reasonably likely to occur]." ECF No. 383 at 10. "STEC is a foreseen hazard in beef [but] Cargill required a variety of controls at its suppliers, such as hot water wash, PAA treatment, and test and hold procedures, making it [not reasonably likely to occur]." ECF No. 383 at 10. Therefore, Defendants ask the Court to prohibit Plaintiffs from arguing that Section 417.3(b) required Cargill to reassess its HACCP plan because Cargill not only deemed STEC a foreseen hazard that was not reasonably likely to occur, but Cargill also maintained a corrective action (i.e., disposal) in its existing HACCP plan for any patty that presumptively tests positive for STEC.

The Court is not persuaded that 9 C.F.R. § 417.3(b) is irrelevant or unduly prejudicial. Under Defendants' logic, Cargill's HACCP plan is immune from scrutiny. It is not. Section 417.3(b) and the adequacy of Cargill's HACCP plan goes to the heart of this case — the standard of care Defendants owed Plaintiffs. *See, e.g.*, *Araujo v. Coachella Valley Water Dist.*, No. 20-cv-01800, 2022 WL 4181004, at *11 (S.D. Cal. Sept. 12, 2022) (citing Cal. Evid. Code § 669); *Mize v. Mentor Worldwide LLC*, 51 Cal. App. 5th 850, 865 (2020) ("Federal statutes . . . and federal regulations . . . may provide the applicable state standard of care, satisfying the first of [the § 669(a)] requirements."). Indeed, FSIS' regulations contemplate that an HACCP plan may still be "found to be inadequate" for various reasons, including: "[e]stablishment personnel are not performing tasks specified in the HACCP plan;" "[t]he establishment fails to take corrective actions . . . ;" "HACCP

31

records are not being maintained . . . ;" or "[a]dulterated product is produced or shipped." 9 C.F.R. § 417.6. Given that Plaintiffs allege Cargill produced and shipped beef patties adulterated with STEC despite Cargill's HACCP plan, Defendants' Motion places the cart before the horse by attempting to preclude any discussion of whether Cargill adequately complied with the applicable regulatory requirements. This question must be answered at trial.

Furthermore, while such argument may prejudice Defendants, "[r]elevant evidence is inherently prejudicial . . . ." *Chopourian*, 2011 WL 6396500, at *2 (quoting *Hankey*, 203 F.3d at 1172). Rule 403 only bars prejudicial evidence when it substantially outweighs its probative value. Here, the FSIS regulations are extremely probative of Cargill's duty of care. Accordingly, the Court denies Defendants' Motion in Limine.

## IV.   *DAUBERT* MOTIONS

### A.   Legal Standard

Federal Rule of Evidence 702 sets out the criteria for "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify. Fed. R. Evid. 702. The party offering an expert bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 & n.10 (1993); *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 3:02-cv-2258, 2007 WL 935703, at *4 (S.D. Cal. Mar. 7, 2007). Nevertheless, "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).

Before admitting expert testimony, a trial court "must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue." *Daubert*, 509 U.S. at 592-93. This requires the court to determine if the expert's reasoning or methodology underlying the testimony: (1) is scientifically valid ("the reliability prong"); and (2) can be applied to the facts at issue ("the relevance prong"). *Daubert*, 509 U.S. at 592-93; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998).

First, an expert's testimony is reliable "if the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1056 (9th Cir. 2003). However, expert testimony may also rest on personal knowledge, experience, education, or training of the expert. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *see Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004). To determine if the expert testimony is reliable, a court may examine: (1) whether the theory or methodology can be (and has been) tested; (2) whether the theory or methodology has been subjected to peer review; (3) the known or potential rate of error of the theory or methodology; and (4) whether the theory or methodology is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. Still, this "list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141-42.

Second, the relevance prong requires the expert's testimony be "'relevant to the task at hand,' i.e., that it logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) [hereinafter, "*Daubert II*"] (quoting *Daubert*, 509 U.S. at 597). Relevance requires opinions that would assist the trier of fact in reaching a conclusion necessary to the case. *See Kennedy*, 161 F.3d at 1230.

Together, the two prongs of the *Daubert* analysis focus on the principles and methodology underlying an expert's testimony, not on the expert's ultimate conclusions. 509 U.S. at 595. Nevertheless, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether

his testimony has substance such that it would be helpful to a jury." *Ala. Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013). Therefore, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043-44 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)).

Ultimately, a district court has broad latitude in deciding how to measure reliability and making the reliability determination. *Kumho Tire*, 526 U.S. at 142. However, in doing so the court must act as "a gatekeeper, not a fact finder." *Primiano*, 598 F.3d at 565 (citation and quotation marks omitted). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *City of Pomona*, 750 F.3d at 1044. "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy*, 161 F.3d at 1231 (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

Defendants filed motions to exclude Plaintiffs' causation expert, Dr. Kirk Smith; Plaintiffs' microbiology and food safety systems expert, Scott Stillwell, Ph.D.; and Plaintiffs' two orthopedic experts, Dr. Roberto Civitelli and Dr. Michael Mont. The Court addresses each expert in turn below.

## B.   Dr. Kirk Smith

Defendants move to exclude Plaintiffs' epidemiology expert, Dr. Kirk Smith, under Federal Rules of Evidence 403, 702, and 703 because his testimony related to general and specific causation: (1) relies solely on unpublished and unverified documents from the CDC; (2) fails to consider alternative causes; (3) makes an unfounded analytical leap by concluding that the cause of the recruit outbreak was ground beef, even though the CDC did not come to the same conclusion; and (4) is based on a level of certainty below what the epidemiological community requires by improperly conflating his burden of proof at

trial with the standard for *Daubert*. ECF No. 338 at 12-20, ECF No. 388 at 4-11.[23] The Court denies and grants Defendants' Motion in part.

The Court takes issue with the reliability of Dr. Smith's conclusion regarding the source of the STEC outbreak. Based largely on the CDC's Report, he draws the conclusion that Cargill's hamburgers and cheeseburgers were the cause of the STEC outbreak:

> I hold the opinion, to a reasonable degree of epidemiologic probability, that the source of the October/November 2017 STEC outbreak at MCRD San Diego and Camp Pendleton was contaminated frozen ground beef patties that Sodexo used to prepare hamburgers for Marine recruits on October 21, 2017, and likely earlier dates as well.

\* \* \*

> The laboratory, epidemiologic, and environmental data all fit together to create a clear picture of what happened: the outbreak began as a common source outbreak caused by the consumption of undercooked hamburgers/cheeseburgers.

\* \* \*

---

[23] In their Reply brief, Defendants also ask the Court to exclude the Affidavit of Dr. Kirk Smith [ECF No. 364-9] that Plaintiffs filed in response to a separate motion. *See* ECF No. 388 at 11-12. A reply brief to a separate motion is not the proper vehicle for such a request. *See* Fed. R. Civ. P. 7(b). Even if it were, "Rule 26 requires that expert disclosures be complete, 'there is no requirement that such disclosures cover any and every objection or criticism of which an opposing party might reasonably complain. In other words, an expert need not stand mute in response to an opposing party's *Daubert* motion.'" *Star Ins. Co. v. Iron Horse Tools, Inc.*, No. 16-cv-48, 2018 WL 3079493, at *6 (D. Mont. Feb. 7, 2018) (quoting *Allgood v. Gen. Motors Corp.*, No. 102-cv-1077, 2006 WL 2669337, at *5 (S.D. Ind. Sept. 18, 2006)). The Court finds that Dr. Smith's Affidavit is neither substantially different from his expert report nor an attempt to deepen or strengthen his prior expert report.

> My conclusion that Cargill's frozen ground beef patties were the original source of contamination in this outbreak is based on multiple epidemiologic and environmental factors.
>
> * * *
>
> Given that the environmental observations were related to preparation of the ground beef patties, it is clear to me that in the investigators' minds, undercooked ground beef equates to the undercooked ground beef patties served on burger Saturday.
>
> * * *
>
> In conclusion, it is my opinion to a reasonable degree of epidemiologic probability that the source of this STEC outbreak was frozen ground beef patties manufactured by Cargill and used by Sodexo to make hamburgers on October 21 (and possibly October 14), 2017.

ECF No. 338-2 at 115, 120, 123-24.

The CDC's Report did not reach the conclusions Dr. Smith claims it does. It explicitly stated the opposite. *See, e.g.*, ECF No. 338-2 at 60 ("No individual beef dishes or other individual food exposures were significantly associated with case status."). The Case-Control Study did find an observed statistical association between ill recruits and "undercooked beef." *Id.* "Once epidemiologists have concluded from [] studies that there is an association between an agent and an outcome, they often assess causation through a framework called the 'Bradford Hill criteria.'" *In re Roundup*, 390 F. Supp. 3d at 1116.[24]

---

[24] These criteria are generally accepted factors relevant to assessing causation and include: (1) the strength of the association; (2) consistency; (3) specificity; (4) temporality; (5) biological gradient or dose response; (6) biological plausibility; (7) coherence with other scientific knowledge; (8) experimental evidence; and (9) analogy. *Id.* (citing Austin Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proceedings of the Royal Society of Medicine 295 (1965)).

Here, Dr. Smith improperly extrapolates the CDC's findings into a conclusion that Cargill's frozen beef patties were the source of the outbreak without providing any support outside of the Case-Control Study — much less a sufficient analysis under the Bradford Hill criteria. Dr. Smith's conclusion appears to be premised on the incorrect belief that he may lower the rigor of scientific certainty required to make such conclusions in epidemiology because this is a legal proceeding. In his deposition, Dr. Smith explained:

> Q.    . . . . The word "determined" is a term of art. I mean, when they say the source was not determined, it means the military did not identify a cause, right?
>
> A.    Yeah . . . . **-- in epidemiology if you say "definitively linked" or "confirmed" or "determined," that's all the real high degree of confidence that gets up to like 99 percent**. . . . That's about level we're talking about.
>
>                                               \* \* \*
>
> Q.    You don't think that other ground beef products, like spaghetti sauce, meatballs, meatloaf, the other ground beef items, you don't think that they're possible cause. You're 100 percent all in on ground beef served on burger Saturday?
>
> A.    Not 100 percent. . . . Again, I agreed with CDC that it wasn't definitive . . . ; but **-- because my standard for that, if you make me put a percentage on it of 99 percent** or whatever to say that. **My understanding is the standard is a reasonable degree of epidemiologic probability, or more likely than not, and that's 51 percent.** So I am – what I'm saying is like **I'm not at the level of 99 percent, but I'm way above 51 percent** that . . . the most likely source was the undercooked burgers.
>
>                                               \* \* \*

Q.    [] **For purposes of your professional work as an epidemiologist for the state of Minnesota, when you do your professional work**, you don't determine a cause unless you determine a cause, until you've concluded that you've got a cause, right?

                         \* \* \*

A.    . . . [W]e can go a number of ways with conclusions. We can say this was the vehicle. This was a confirmed vehicle. **If we think something is the vehicle but we don't reach that 99 percent-ish level, then we might say a vehicle was not confirmed; however, this vehicle was thought to be the most likely cause.**

ECF No. 338-2 at 190, 192-94 (emphases added). However, as an expert witness, Dr. Smith must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

The Court finds no issue with other aspects of Dr. Smith's opinion and testimony. He was entitled to rely on the CDC's Report. *See United States v. W.R. Grace*, 455 F. Supp. 2d 1181, 1188 (D. Mont. 2006) (explaining epidemiological case-control studies "frequently provide the basis for expert opinions relating to causation in legal proceedings."). Dr. Smith correctly interprets the CDC's Report as "demonstrat[ing] a statistically significant association between the consumption of undercooked beef and being a confirmed STEC case." ECF No. 338-2 at 121. The CDC's Report also details the alternative causes the Epi-Aid Team considered and their reasons for dismissing them. *See supra* pp. 11-10. Dr. Smith's Expert Report does too. *See* ECF No. 338-2 at 118-20, 122-23. It makes no difference that the Epi-Aid Report is not published in a peer-reviewed journal. *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017) ("[E]xpert testimony may still be reliable and admissible without peer review and publication."). Nor does it matter that the CDC — and not Dr. Smith — conducted the

Case-Control Study. *See Southland Sod Farms*, 108 F.3d at 1142 (finding immaterial to admissibility the fact that expert's opinions were based on data others collected). "[E]ven if the tests were not conducted independently or subjected to peer review, these are only two of the ways Plaintiffs can demonstrate admissibility. Plaintiffs may also show that [Dr. Smith]'s testimony is based on 'the scientific method, as it is practiced by (at least) a recognized minority of scientists in the[] field.'" *Id.* (quoting *Daubert II*, 43 F.3d at 1319). Plaintiffs have met their burden here.

Accordingly, the Court grants in part Defendants' Motion by precluding Dr. Smith from testifying that ground beef patties — as distinct from undercooked beef products more generally — were the cause of the recruit outbreak, and denies Defendants' Motion as to the remainder of his testimony without prejudice to renewal at the time of trial.

## C.   Scott Stillwell, Ph.D.

Defendants move to exclude Plaintiffs' expert in microbiology and food safety systems because he is unqualified to be an expert and his testimony is based on an unreliable methodology. ECF No. 339 at 6. The Court denies Defendants' Motion.[25]

### 1.   Stillwell's Qualifications

A testifying expert may be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *see Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991) ("A witness can qualify as an expert through practical experience in a particular field, not just through academic training"). Ultimately, "[t]he threshold for

---

[25]   In their Reply Brief, Defendants ask to strike Stillwell's Supplemental Affidavit [ECF No. 356-13]. *See* ECF No. 387 at 10-11. A reply brief is not the proper vehicle for such a request. *See* Fed. R. Civ. P. 7(b). Nevertheless, the Court denies this request as moot because the Court's does not rely on the Supplemental Affidavit.

qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and experience suffices." *PixArt Imaging, Inc.*, 2011 WL 5417090, at *4.

Stillwell studied as an undeclared major at the University of Arkansas ("UoA") between 1981 and 1988, but never received a bachelor's degree. ECF No. 339-2 at 46. In 1988, Stillwell began working as a part-time microbiologist at Tyson Foods in Arkansas. Concurrent to working at Tyson, Stillwell earned his first degree, a Masters of Business Administration in International Business, from Heriot-Watt University of Scotland in 2004 via a five-year part-time distance learning program. ECF No. 339-2 at 60-61, 137. After Tyson promoted Stillwell to Vice-President of Food Safety and Quality Assurance in 2005, he was admitted to UoA's graduate Food Safety Program in 2006. ECF No. 339-2 at 60-61, 122-23. Through distance learning and conducting his dissertation research in Tyson's lab, Stillwell earned his Ph.D. in Poultry Science with a focus on Microbial Food Safety from UoA in 2014. *See* ECF No. 339-2 at 61, 126. In total, Stillwell spent 31 years in the Poultry Division of Tyson in various food safety capacities, including a stint conducting due diligence for Tyson's purchase of a beef and pork facility. *See* ECF No. 339-2 at 47, 64-65, 136-37.

Stillwell lacks the academic and professional experience to be qualified as a "microbiologist." *See TC Rich, LLC v. Shaikh*, No. 19-cv-2123, 2021 WL 4812314, at *2 (C.D. Cal. May 4, 2021) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)). However, Plaintiffs may offer Stillwell as an expert in microbial food safety. Defendants' arguments concerning Stillwell's poor academic performance, lack of academic coursework in statistics or microbiology, and primarily poultry-based experience all go to weight of his testimony — not admissibility. *See In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004) ("A lack of specialization affects the weight of the expert's testimony, not its admissibility.").

### 2.    Stillwell's Methodology

Defendants' attacks on Stillwell's methodology fall into three buckets. None are a basis to bar Stillwell's testimony.

*First,* Defendants argue that Stillwell invents industry standards, often based purely on his personal experience at Tyson. Specifically, Defendants claim Stillwell "improperly import[s] the FSIS goal for MT-43 routine sampling of 0.2% as an industry standard for in-plant finished product testing"; opines purely based on personal opinion "that because Cargill assessed the hazard as [not reasonably likely to occur], Cargill should not also do finished product testing on 100% of its production lots"; incorrectly "opines that Cargill should conduct a root cause analysis for each presumptive positive on finished product testing"; and "believes Cargill should have applied a second round of PAA treatment at the grind facility" even though this is "unsupported by industry standards or scientific research." ECF No. 339 at 17-19, 24-25.

Expert witnesses, including Stillwell, may testify as to relevant industry practice or standards. *See, e.g.*, *Muccie v. Dailey*, No. 20-cv-66, 2022 WL 1746755, at *1 (D. Mont. May 31, 2022); *J.B. ex rel Bell v. Mead Sch. Dist. No. 354*, No. 08-cv-223, 2010 WL 5173164, at *9 (E.D. Wash. Dec. 10, 2010).[26] "Testimony about industry standards, or policies adopted by other institutions to comply with applicable regulations, is not generally regarded as a legal opinion or conclusion." *Roohbakhsh v. Bd. of Trustees of Neb. State Coll.*, No. 8:17-cv-31, 2019 WL 5653448, at *3 (D. Neb. Oct. 31, 2019) (collecting cases); *see United States v. Holmes*, No. 5:18-cr-00258, 2021 WL 2035177, at *4 (N.D. Cal. May 21, 2021) (allowing expert testimony that will "focus will be on whether [a company] adhered to industry standards, not whether [the company] violated applicable

---

[26]    Defendants cite *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000), and *IGT v. All. Gaming Corp.*, No. 2:04-cv-1676, 2008 WL 7084606, at *7 (D. Nev. Oct. 21, 2008), in support of their claim that "[e]xpert opinions should be based on ***known*** standards in the industry that have been the subject of peer-reviewed publication." ECF No. 339 at 17. Neither case states that proposition.

regulations. While certain conduct may implicate regulations, the Court anticipates that any confusion or unfair prejudice resulting from testimony about regulatory violations can be mitigated by careful examination and thoughtful language."). Although Defendants are correct that there is neither a regulatory requirement to conduct in-plant finished product testing nor a regulatory standard for such testing,[27] the Court cannot exclude Plaintiffs' expert because his views on industry standards are more stringent than regulatory requirements. *See Spearman Corp. Marysville Div. v. Boeing Co.*, No. 20-cv-13, 2022 WL 6751797, at *4 (W.D. Wash. Oct. 11, 2022) ("[r]eliability of expert opinions about industry standards 'depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" (quoting *Hangarter*, 373 F.3d at 1017)).

***Second,*** Defendants claim Stillwell offers opinions unsupported by facts, lacking a scientifically valid theory, and/or using incomplete data. In particular, Defendants claim Stillwell "opines it was '95% likely' contaminated product left North Butler in 2017" without providing a calculation; "attempts to opine on the necessary sample size required for finished product testing to achieve confidence that no product was contaminated" without Cargill's data related to homogeneity of its blending process; and lobs various other critiques about the efficacy and implementation of Cargill's HACCP plan. ECF No. 339 at 20-23.

Defendants overstate Stillwell's opinion. The relevant portion of Stillwell's deposition testimony reads:

> Q. And even though it's not possible to estimate the probability
>
> that a specific lot is contaminated, you are 95 percent sure that

---

[27] Defendants argue "there is not a standard setting an in-plant finished product presumptive positive threshold." ECF No. 339 at 17-18. Yet, Defendants also argue that "FSIS guidelines indicate in-plant finished product presumptives should generally be below 1% . . . ." *Id.* at 18. There is either a standard or there is not. Notably, the FSIS directive Defendants cite states STEC positives occur "typically less than 1%" but was published in 2020 — not the relevant time period of this lawsuit. ECF No. 339-2 at 152.

the beef shipped to Sodexo in – in the September/October time frame of 2017 was contaminated?

A. **I didn't say that. I said that it is likely -- 95 percent likely that at some time in 2017, Cargill shipped contaminated product. I have made no association specifically to the Sodexo product.** But when you look at the serial -- the series of events that has to happen for a large number of people to get sick, the -- the gross breakdowns that has to occur all along the process, including preparation and serving to the consumers, in order for all of those things to happen, it is highly likely given what I know about their general production and manufacturing controls that that lot left the -- or left the Cargill facility contaminated.

ECF No. 339-2 at 79-80 (emphasis added). However, Stillwell explains that he reached this conclusion "because there's no amount of testing that can assure 95 percent confidence that the product is safe, other than testing 95 percent of the product." *Id.* at 78.

To the extent that Defendants object to the methodology behind Stillwell's conclusions, "[d]isputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy*, 161 F.3d at 1231 (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

**Third,** Defendants argue the Court should exclude Stillwell because he "relied on information obtained under false pretenses" by "misrepresenting himself to a federal agent." ECF No. 339 at 25. The Court disagrees.

Stillwell issued his expert report on January 21, 2021. ECF No. 339-2 at 6. Stillwell communicated with FSIS in February 2021 — after issuing his expert report. ECF No. 339-

43

2 at 313-350.[28] Based on this timing, Stillwell could not have relied on his communications with FSIS to form his opinions. Furthermore, there is no indication that Stillwell intends to testify about or rely on the FSIS communication at trial.

Defendants' concerns about Stillwell's qualifications and methodology are insufficient to exclude his testimony. Stillwell does not appear to be basing his opinion solely on subjective belief. He instead bases his opinions on his training and experience, which meets the standards under Federal Rule of Evidence 702 and *Daubert*. Accordingly, the Court finds no basis to exclude Stillwell's testimony and denies Defendants' *Daubert* Motion.

### D.     Dr. Michael Mont

Two Plaintiffs in these consolidated cases, Hunter Browning and Conner Lader, are unique because they contend that their STEC exposure caused them to develop osteonecrosis of the femoral head, which caused their hip joints to collapse.[29] In support of their claims, Plaintiffs intend to call Dr. Michael Mont, a retained orthopedic surgeon, as an expert witness to testify that STEC caused Browning and Lader's hip injuries. Sodexo, Cargill, and US Foods move to limit Dr. Mont's testimony by precluding him from opining that STEC caused Plaintiffs' hip injuries because there are no published or peer-reviewed studies connecting STEC and osteonecrosis, the medical community has never found a causal connection between STEC and osteonecrosis, and Dr. Mont is not a toxicologist. ECF No. 346 at 13-15. The Court denies Defendants' Motion.

Dr. Mont uses various published studies, his clinical experience, and a review of the Plaintiffs' medical records to support his conclusion that Plaintiffs' hip injuries were a

---

[28]     Stillwell introduced himself to FSIS by explaining "I'm a consultant and the 'hypothetical' management disagrees with my conclusions after auditing records, HACCP plans, supplier approvals, etc." ECF No. 339-2 at 333. Stillwell is an expert consultant Plaintiffs retained to opine on Cargill's HACCP plan.

[29]     Osteonecrosis (or Avascular Necrosis) is a disease that results from the loss of blood supply to the bone.

result of osteonecrosis caused by their exposure to STEC. Citing various studies, including his own publications, Dr. Mont notes that for 15 to 20% of osteonecrosis cases there is no known risk or associated factor identified, but many of the patients have inherited coagulopathies. *See* ECF No. 352-7 at 5, 14.[30] Dr. Mont summarizes various studies documenting how *E. coli* releases shiga toxin, which induces endothelial cell damage leading to thrombus formation within the microvasculature that can cause tissue ischemia. *See id.* at 3-4, 12-13. Although the coagulopathy STEC causes typically affects the kidneys and the brain, Dr. Mont reasons that the same mechanisms responsible for thrombus formation in STEC could be involved in the development of osteonecrosis of the femoral head. *See id.* at 3, 12. Based on his review of the Plaintiffs' medical records, the studies he cites, and his clinical experience, Dr. Mont concludes to a reasonable degree of medical certainty that STEC directly caused Plaintiffs' femoral head osteonecrosis that necessitated their hip replacements. *See id.* at 5-7, 14-16.[31]

To be clear, Dr. Mont does not cite a single study concluding that STEC specifically causes osteonecrosis. Indeed, he concedes no such study exists. *See* ECF No. 346-1 at 20. Defendants argue that this alone justifies Dr. Mont's exclusion. *See* ECF No. 386 at 6-8. But "[n]ot knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we don't know precisely how the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage somehow." *Daubert II*, 43 F.3d at 1314; *see Messick*, 747 F.3d at 1199 ("[W]e do not require that an expert be able to identify the sole cause of a

---

[30]   Corticosteroids and alcohol account for approximately 80% of osteonecrosis cases, according to Dr. Mont. *See* ECF No. 352-7 at 5, 14.

[31]   In their Reply Brief, Defendants ask this Court to exclude the case report [ECF No. 352-5] of the Plaintiffs' treating physician, U.S. Marine Corps Captain Dr. Brian Barlow, which Plaintiffs attached to their Response Brief. *See* ECF No. 386 at 12-14. A reply brief is not the proper vehicle for such a request. *See* Fed. R. Civ. P. 7(b). Nevertheless, the Court denies this request as moot because the Court does not rely on the case report.

medical condition in order for his or her testimony to be reliable."); *Kennedy*, 161 F.3d at 1230 ("The fact that a cause-effect relationship between Zyderm and lupus in particular has not been conclusively established does not render Dr. Spindler's testimony inadmissible."). The "sufficiently compelling proof" need not be peer-reviewed epidemiological, animal, or cell studies. *See, e.g.*, *Wendell*, 858 F.3d at 1235-36 ("Perhaps in some cases there will be a plethora of peer reviewed evidence that specifically shows causation. However, such literature is not required in each and every case."); *McClellan*, 710 F. Supp. 2d at 1109 ("[W]hile epidemiological evidence is significant and can be helpful, it is not necessary to establish general causation.").

Furthermore, "a reliable differential diagnosis may form the basis of an expert's causation testimony." *Messick*, 747 F.3d at 1197-98 (collecting cases).[32] "[A]nd there is nothing wrong with a doctor relying on extensive clinical experience when making a differential diagnosis." *Id.* at 1198. "When an expert rules out a potential cause in the course of a differential diagnosis, the 'expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation.'" *Id.* (quoting *Clausen*, 339 F.3d at 1058). However, "[w]e do not require experts to eliminate all other possible causes of a condition for the expert's testimony to be reliable." *Wendell*, 858 F.3d at 1237.

---

[32] "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. A reliable differential diagnosis typically, though not invariably, is performed after 'physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests,' and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Clausen*, 339 F.3d at 1057 (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)).

Here, Dr. Mont's opinions on causation are reliable because he cites various studies which he combines with his clinical experience to conduct a differential diagnosis. ECF No. 352-7 at 5-7, 14-16. Following his review of Plaintiffs' medical records, Dr. Mont uses his clinical experience to rule out the other potential causes for Plaintiffs' osteonecrosis such as alcohol or tobacco abuse, high dose corticosteroids, and pre-existing hip conditions. *Id.* After eliminating these potential causes, Dr. Mont concludes to a reasonable degree of medical certainty that STEC directly caused Plaintiffs' femoral head osteonecrosis that necessitated their hip replacements. *Id.* Accordingly, the Court denies Defendants' Motion because Dr. Mont's opinion is based on a methodology that is reliable and relevant. *See, e.g.*, *Wendell*, 858 F.3d at 1237 (reversing trial court for excluding expert testimony due to lack of studies showing a causal link between specific drug and disease at issue); *Messick*, 747 F.3d at 1199 ("A doctor using a differential diagnosis grounded in significant clinical experience and examination of medical records and literature can certainly aid the trier of fact and cannot be considered to be offering 'junk science.'").

### E.    Dr. Roberto Civitelli

In further support of their claim that STEC caused Plaintiff Browning and Lader's hip injuries, Plaintiffs' retained endocrinologist Dr. Roberto Civitelli. Sodexo, Cargill, and US Foods move to exclude Dr. Civitelli as an expert witness because osteonecrosis has never been reported as a predictable consequence of STEC infections and there are no published or peer-reviewed studies connecting osteonecrosis and STEC. ECF No. 346 at 6, 8-13. However, during the briefing of this Motion, Plaintiffs indicated that they "do not presently intend to call Dr. Civitelli at trial, aside from an unforeseen circumstance where Dr. Mont [i]s unable to testify . . . ." ECF No. 352 at 5 n.1. Therefore, the Court denies without prejudice Defendants' Motion as moot. Should Plaintiffs later seek to call Dr. Civitelli to testify at trial, Defendants may again raise their Motion.

## V.    SUMMARY JUDGMENT MOTIONS

### A.    Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The movant always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by: (1) presenting evidence that negates an essential element of the nonmoving party's case; or (2) demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id*. at 322-23; *see Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the movant fails to discharge this initial burden, the Court may deny summary judgment and need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970). However, if the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." (citing *Anderson*, 477 U.S. at 242, 252)). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions,

1   answers to interrogatories, and admissions on file," designate "specific facts showing that

2   there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

3      When making this determination, the court must view all inferences drawn from the

4   underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475

5   U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of

6   legitimate inferences from the facts are jury functions, not those of a judge, [when] he is

7   ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

8      **B.   Liability**

9      Defendants move for summary judgment on Plaintiffs' strict liability and negligence

10  claims because Plaintiffs fail to establish that Defendants breached a duty of care or caused

11  Plaintiffs' injuries. ECF No. 341 at 22; *see* ECF No. 363.[33] Defendants advance three

12  arguments in support of their Motion. Because all arguments fail, the Court denies

13  Defendants' Motion.

14     ***First,*** Defendants argue that proving causation here "requires expert testimony." *Id.*

15  at 23. However, "Plaintiffs disclosed only one expert opinion to proffer that the ground

16  beef patties were the source and cause of the outbreak and Plaintiffs' injuries, their

17  epidemiologist, Dr. Smith." *Id.* at 23-24. Thus, Defendants reason "if the Court grants the

18  pending *Daubert* motion as to Dr. Smith, then Plaintiffs' strict liability and negligence

19  claims must fail and Cargill is entitled to summary judgment as a matter of law." *Id.* at 25.

20     Here, the Court denied Defendants' Motion to Exclude the CDC Report, and granted

21  their Motion to Exclude Dr. Smith's testimony only as to his conclusion that Defendants'

22  beef patties caused the outbreak. As Dr. Smith explained, "the CDC study demonstrated a

23  statistically significant association between the consumption of undercooked beef and

24  being a confirmed STEC case—and this was the only finding that was statistically

25  associated with illness. Cases were 2.4 times more likely to report eating visibly

26

27  _____

28  [33]   Plaintiffs agreed to strike their failure to warn and negligent training or supervision
    theories. *See* ECF No. 368 at 23.

undercooked beef than recruits who did not become ill." ECF No. 338-2 at 121. Although this conclusion does not definitely establish causation — and Defendants will have ample opportunity to challenge this conclusion at trial — there nonetheless exists a genuine issue of material fact as to causation.

*Second,* Defendants assert that Plaintiffs are unable to prove negligence because "Cargill did not breach a duty." ECF No. 341 at 26. Defendants argue that neither the evidence nor the expert testimony support Plaintiffs' claims that Cargill failed to reassess its HACCP Plan and that Cargill had a duty to monitor Sodexo — especially if the Court grants Defendants' Motion in Limine to exclude references to 9 C.F.R. § 417.3(b). ECF No. 341 at 26-27.

The Court denied Defendants' Motion in Limine to exclude references to 9 C.F.R. § 417.3(b). *Supra* pp. 29-32. Furthermore, the question of any duty Defendants owed to Plaintiffs is likewise one for a jury to determine. *See Mexicali Rose v. Super. Ct.*, 1 Cal. 4th 617, 631 (Cal. 1992) ("[W]hether bones or other injurious substances ought to be anticipated in a particular dish becomes a question for the trier of fact, unless as a matter of law the food was fit for consumption because the substance was natural to the food served." (citing Cal. Com. Code §§ 2314-15)); *Dougherty v. Lee*, 74 Cal. App. 2d 132, 137 (Cal. Dist. Ct. App. 1946) ("Where the evidence is susceptible of a reasonable inference that death or illness resulted from the eating of contaminated food, a prima facie case of negligence or of a breach of implied warranty of the fitness of the food has been established, and it is erroneous for the court to direct a verdict for the defendant."). As such, the Court finds that a genuine issue of material fact exists as to Cargill's potential duty to Plaintiffs.

*Third,* Defendants argue that "[a]bsent Dr. Stillwell's opinion and conclusion, Plaintiffs are left with no other competent expert evidence, and no other such evidence, that Cargill was negligent in its manufacturing of the ground beef patties at issue or that the patties at issue were defective and caused the Plaintiffs' injuries." ECF No. 341 at 29.

1    Because the Court denied Defendants' Motion to Exclude, Stillwell's testimony

2    contrasting industry practices against Cargill's practices establishes a genuine issue of

3    material fact as to whether Cargill was negligent in manufacturing the ground beef patties

4    at issue. *Supra* pp. 39-44.

5    Viewing all inferences drawn from the underlying facts in Plaintiffs' favor,

6    Defendants have not established the absence of a genuine issue of material fact.

7    Accordingly, the Court denies Defendants' Motion for Summary Judgment on liability.

8    ### C.   Punitive Damages

9    Cargill and Sodexo separately move for summary judgment on Plaintiffs' claim for

10   punitive damages. Both Defendants argue Plaintiffs cannot meet the higher standard of

11   proof to warrant punitive damages, but Sodexo separately contends that Plaintiffs cannot

12   establish corporate liability. Neither motion is successful.

13   ### 1.   *Heightened Standard of Proof*

14   Both Defendants argue Plaintiffs fail to meet the heightened standard of proof

15   required to seek punitive damages. *See* ECF No. 341 at 31; ECF No. 343-1 at 7-27. The

16   evidence suggests otherwise.

17   Under California law, "mere or even gross negligence will not support an award of

18   punitive damages." *Molina v. J.C. Penney Co.*, No. 14-cv-04201, 2015 WL 183899, at *3

19   (N.D. Cal. Jan. 14, 2015) (quoting *Simmons v. S. Pac. Transp. Co.*, 62 Cal. App. 3d 341,

20   368 (Cal. Ct. App. 1972)). Punitive damages are only appropriate "where it is proven by

21   clear and convincing evidence that the defendant has been guilty of oppression, fraud, or

22   malice . . . ." Cal. Civ. Code § 3294. Because fraud is not alleged here, the only two bases

23   for punitive damages are oppression and malice. "'Oppression' means despicable conduct

24   that subjects a person to cruel and unjust hardship in conscious disregard of that person's

25   rights." *Id.* § 3294(c)(2). "[M]alice is defined as either: (1) conduct which is intended by

26   the defendant to cause injury to the plaintiff or (2) 'despicable conduct which is carried on

27   by the defendant with a willful and conscious disregard of the rights or safety of others.'"

28   *Diew v. Amazon.com Servs., LLC*, No. 21-cv-01462, 2021 WL 2435265, at *5 (N.D. Cal.

June 15, 2021) (quoting *Rhynes v. Stryker Corp.*, No. 10-cv-5619, 2011 WL 2149095, at *5 (N.D. Cal. May 31, 2011)). "California courts have defined 'despicable conduct' as conduct which is 'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary people.'" *Id.*

Nevertheless, this heightened standard of proof does not automatically preclude claims for punitive damages based on nonintentional torts. "Where nonintentional torts involve conduct performed without intent to harm, punitive damages may be assessed when the conduct constitutes conscious disregard of the rights or safety of others." *Chamberlin v. Hartog, Baer & Hand, APC*, No. 19-cv-08243, 2022 WL 1502587, at *7 (N.D. Cal. May 12, 2022) (quoting *Bell v. Sharp Cabrillo Hosp.*, 212 Cal. App. 3d 1034, 1044 (Cal. Ct. App. 1989)). "To establish conscious disregard, a plaintiff must show 'that the defendant was aware of the probable dangerous consequences of his conduct, and that he wil[l]fully and deliberately failed to avoid those consequences.'" *Lannes v. CBS Corp.*, No. 12-cv-1876, 2013 WL 12125425, at *4 (C.D. Cal. July 3, 2013) (quoting *Hoch v. Allied-Signal, Inc.*, 24 Cal. App. 4th 48, 61 (Cal. Ct. App. 1994)). Accordingly, "[p]unitive damages may be awarded in a product liability action if it is shown that the defendant placed a product on the market in conscious disregard of the safety of consumers and others." *Lannes*, 2013 WL 12125425, at *4 (quoting *Ehrhardt v. Brunswick, Inc.*, 186 Cal. App. 3d 734, 741 (Cal. Ct. App. 1986)); *see, e.g.*, *Morris v. Parke, Davis & Co.*, 573 F.Supp. 1324, 1326-27 (C.D. Cal. 1983) (collecting cases).

"[T]o defeat a summary judg[]ment motion Plaintiff must produce evidence such that a reasonable juror could find punitive damages appropriate by clear and convincing evidence." *Hubka v. Paul Revere Life Ins. Co.*, 215 F. Supp. 2d 1089, 1094 (S.D. Cal. 2002). Plaintiffs have met that burden here as to both Defendants. As the Court indicated in its prior Order on August 18, 2020, "Plaintiffs allege a long-standing pattern of inaction, which, if proven true, may show a conscious disregard of the rights or safety of others." ECF No. 175 at 5. Plaintiffs have proffered evidence that Cargill and Sodexo were aware of the probable dangerous consequences of producing and serving beef adulterated with

STEC if not properly cooked. *See, e.g.*, ECF No. 403-5 at 2 (Sodexo's Ground Beef Policy); ECF No. 356-2 at 2 (2007 FSIS Notice of Intended Enforcement). Despite this knowledge, Plaintiffs allege that Defendants willfully and deliberately failed to avoid the consequences of producing and serving STEC-adulterated beef in conscious disregard of the safety of consumers, like Plaintiffs. *See, e.g.*, ECF No. 312 at 25-26 ("And for its malicious conduct carried on with a willful and conscious disregard of the rights or safety of Marine recruits, including the Plaintiff, CARGILL is liable to VINCENT GRANO for punitive damages under California Civil Code § 3294."); ECF No. 312 at 26 ("And for its malicious conduct carried on with a willful and conscious disregard of the rights or safety of Marine recruits, including the Plaintiff, SODEXO is liable to VINCENT GRANO for punitive damages under California Civil Code § 3294."). In support of their claims, Plaintiffs point to evidence of various alleged deficiencies in the production and handling of the beef served to recruits, which Plaintiffs contend Defendants consciously disregarded.

As to Cargill, Stillwell opines in his Expert Report that Cargill should have adopted an additional control in its production process, such as the introduction of an antimicrobial intervention like peracetic acid. ECF No. 356-12 at 17-19. Given that Cargill conducted an internal study in 2015 that found a peracetic acid treatment resulted in a reduction of STEC in ground beef [ECF No. 404-3 at 1], a reasonable juror could find that Cargill willfully and deliberately avoided adopting the use of peracetic acid on its ground beef in 2017.

For Sodexo's part, Plaintiffs' expert in process management for safe food production, Charles F. Cook, Ph.D., opined in his report that "[a]lthough the recipe for preparing hamburgers and cheeseburgers apparently came from the Marine Corps, Sodexo never reviewed, analyzed or validated the process in the recipe to ensure that it would result in hamburger patties being cooked to a minimum of 155 degrees F for 15 seconds doneness at MH 569." ECF No. 368-13 at 10. Indeed, Sodexo's Director of Health, Safety, and Environment agreed that the process of cooking burgers should be validated "[t]o ensure that the finished product is reaching the minimum temperature requirements for the cooking process." ECF No. 359-6 at 12. Yet, a former Sodexo cook at MH 569 attests

"[t]he grills were old, and some didn't work properly. . . . I did not have a specific amount of time that I cooked the patties. I do not ever recall being informed that there was a minimum amount of time to cook the patties. . . . It was difficult to record the time and temperature for every batch because we were under a lot of pressure to get burgers done as fast as we could, so we'd be more focused on getting food cooked and out to the lines." ECF No. 161-2 at 1-2. Given Sodexo's knowledge of the probable consequences of serving undercooked beef and the Marine Corps' contractually imposed standards for cooking beef, a reasonable juror could find that Sodexo willfully and consciously avoided validating its cooking process at the Marine camps in disregard of the safety and rights of others.

Defendants' argument that their conduct was consistent with industry practices does not preclude an award of punitive damages. *See Pfeifer v. John Crane, Inc.*, 220 Cal. App. 4th 1270, 1299 (Cal. Ct. App. 2013). Here, Plaintiffs have produced clear and convincing evidence that "a reasonable juror could find Defendant[s'] conduct was despicable, caused Plaintiff[s] unjust hardship, and that Defendant[s] knew of that risk and consciously disregarded it." *Laron v. Wright Med. Tech., Inc.*, 587 F. Supp. 3d 1065, 1077 (D. Nev. 2022) (interpreting Cal. Civ. Code § 3294).

### 2.    *Corporate Liability*

Sodexo separately asserts that Plaintiffs do not allege facts sufficient to establish liability for punitive damages against a corporate employer. ECF No. 343-1 at 27-29. The evidence again counsels otherwise.

An employer cannot be held liable for punitive damages based on an employee's acts unless the employer "authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(b). In the case of a corporate employer, liability only attaches where "an officer, director, or managing agent" authorized or ratified the act at issue, or acted with malice in his own right. *Id.* However, the relevant inquiry is not the employee's nominal managerial title, but rather "the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. . . . [U]nder section

3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 577 (Cal. 1999).

"[I]t is a 'fundamental misconception of the required proof' to suggest, as Defendants do, that Plaintiffs are 'required to introduce clear and convincing proof that at least one particular [ ] employee, officer, director or managing agent [of a defendant] had the requisite malicious state of mind[.]'" *Lannes*, 2013 WL 12125425, at *4 (quoting *Romo v. Ford Motor Co.*, 99 Cal. App. 4th 1115, 1140-41 (2002)). "[T]he complexities of the modern corporation are such that '[i]t is difficult to imagine how corporate malice could be shown in the case of a large corporation except by piecing together knowledge and acts of the corporation's multitude of managing agents.'" *Id.* "There is no requirement that the evidence establish that a particular committee or officer of the corporation acted on a particular date with 'malice.'" *Id.* "It is enough if the evidence permits a clear and convincing inference that within the corporate hierarchy authorized persons acted despicably in 'willful and conscious disregard of the rights or safety of others.'" *Id.* "[A] plaintiff may satisfy the 'managing agent' requirement of Civil Code section 3294(b) by presenting evidence beyond mere speculation 'that permits an inference that the information in fact moved upward to a point where corporate policy was formulated.'" *Id.*

Here, Plaintiffs have provided evidence that Sodexo's Director of Health, Safety, and Environment knew that that it was important to validate the process of cooking beef because undercooked beef could carry STEC, but Sodexo failed to do so at the Marine camps at issue. *See* ECF No. 359-6 at 12. Plaintiffs' theory is a direct attack on Sodexo's corporate policy. Accordingly, the Court denies Sodexo's Motion for Summary Judgment on punitive damages.

### D. Sodexo's Cross Claims

Cargill moves for summary judgment on Sodexo's cross claims for breach of indemnification or, alternatively, declaratory judgment. ECF No. 342. Cargill's Motion refers to the cross claims asserted in Cargill's Answer to the Second Amended Complaint

[ECF No. 53 at 25-30] and Sodexo's Answer to the Second Amended Complaint [ECF No. 62 at 11-17]. *See* ECF No. 342 at 8. However, Plaintiffs have amended their complaint twice since the filing of the answers Defendants reference in their Motion for Summary Judgment. *See* ECF No. 176 (amending complaint on August 24, 2020); ECF No. 312 (amending complaint on April 13, 2021). As a result, Defendants also filed amended responsive pleadings. *See* ECF No. 316 (amending answer on April 27, 2021); ECF No. 319 (amending answer on May 4, 2021). "An amended pleading 'supersedes the original, the latter being treated thereafter as non-existent.'" *Ito v. Brighton/Shaw, Inc.*, No. 06-cv-01135, 2007 WL 4328785, at *1 (E.D. Cal. Dec. 10, 2007) (quoting *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997)). "In other words, 'the original pleading no longer performs any function . . . .'" *Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015) (quoting *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992)). Therefore, Defendants' answers to the Second Amended Complaint are treated as if they are "non-existent." *Ferdik*, 963 F.2d at 1262. Instead, Defendants' Answers [ECF Nos. 316, 319] to the Fourth Amended Complaint are the operative responsive pleadings.

Unlike their responsive pleadings to the First and Second Amended Complaints, Defendants' operative Answers notably do not contain cross claims. *See* ECF Nos. 316, 319. "[C]ross-claims should ordinarily be asserted through answer as opposed to a separate pleading . . . ." *Soto v. Greyhound Lines, Inc.*, No. 2:06-cv-01612, 2008 WL 4775911, at *1 (E.D. Cal. Oct. 28, 2008); *see Williams v. Kohl's Dep't Stores, Inc.*, No. 19-cv-397, 2019 WL 9077474, at *3 (C.D. Cal. July 5, 2019) ("The Court construes a motion for leave to file a cross-claim as a motion for leave to amend the answer to include a cross-claim.").[34] Indeed, the Federal Rules provide that "[a] *pleading* may state as a crossclaim any claim

[34]    Counterclaims are treated the same. *See Primerica Life Ins. Co. v. Davila*, No. 1:10-cv-1924, 2011 WL 643395, at *3 (E.D. Cal. Feb. 17, 2011) ("Jill is essentially trying to make the amended counterclaim a stand-alone pleading. This is improper because counterclaims are part of other pleadings.").

by one party against a coparty if the claim arises out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim, or if the claim relates to any property that is the subject matter of the original action." Fed. R. Civ. P. 13(g) (emphasis added).[35] Federal Rule of Civil Procedure 7 defines a "pleading" is "only" (1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer. Fed. R. Civ. P. 7(a).[36] Therefore, Defendants' answers to Plaintiffs' Fourth Amended Complaint are the operative responsive pleadings.

Given that Defendants' operative responsive pleadings do not include any cross claims, the Court denies Sodexo's Motion for Summary Judgment as moot. *See Underwriters at Lloyd's v. Abaxis, Inc.,* No. 19-cv-02945, 2020 WL 1677341, at *4 (N.D. Cal. Apr. 6, 2020) ("A plaintiff that . . . does not replead [a] claim in an amended [pleading], waives the claim." (quoting *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc))); *see also Ito*, 2007 WL 4328785, at *1 ("Since Cross-defendants' motions attack Carson's original and now 'non-existent' cross-claim, Cross-defendants' motions are moot.").

---

[35]    Federal Rule of Civil Procedure 13(g) would not state that a "pleading" can include a cross claim if a cross claim was a pleading itself.

[36]    The fact that Federal Rule of Civil Procedure 7(a) explicitly includes "an answer to a complaint" and "an answer to a crossclaim" to the exclusion of cross claims is by itself evidence that a cross claim is not a separate pleading, but rather, a claim within another pleading. *See, e.g., Domain Prot., LLC v. Sea Wasp, LLC*, No. 4:18-cv-792, 2019 WL 6700976, at *1 (E.D. Tex. July 17, 2019) ("Cross claims must be raised as 'part of the answer, not a separate pleading.'" (citations omitted)); *Mills v. Randell*, No. 2:08-cv-291, 2008 WL 11512346, at *2 n.3 (E.D. Va. Oct. 15, 2008) ("[A] cross-claim must be contained in a pleading as it does not constitute a stand alone pleading."); *Fireman's Fund McGee Marine Underwriters a/s/o Hartung Bros., Inc. v. A & B Welding & Mfg., Inc.*, No. 04-cv-0576, 2005 WL 568055, at *5 (W.D. Wis. Mar. 8, 2005) ("[A] 'cross-claim' is not a 'pleading' as permited by Fed. R. Civ. P. 7."); *F.D.I.C. v. Soden*, 603 F. Supp. 629, 635 (D. Kan. 1984) ("[A] cross-claim must be properly contained in the answer.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E.      Third-Party Claims**

Third-Party Defendant US Foods separately moves for summary judgment on all claims against it because: (1) the statute of limitations bars Plaintiffs' claims; (2) there is no evidence that US Foods was negligent; (3) there is no proof that US Foods caused the outbreak, which is a prerequisite to a strict liability claim; and (4) without an initial finding of liability, Sodexo's claims of indemnity against US Foods fail. *See* ECF No. 340. The Court addresses each of US Foods' contentions below.

### 1.      *The Timeliness of Plaintiffs' Claims*

US Foods contends the evidence shows Plaintiffs discovered, or had reason to discover, the cause of the injuries no later than November 2017; and even if Plaintiffs did not have reason to suspect a factual basis for their claims in November, Plaintiffs failed to reasonably investigate upon being injured in October of 2017. ECF No. 340 at 16-18. Accordingly, US Foods argues that California's two-year statute of limitations for personal injury actions bars Plaintiffs' claims because Plaintiffs did not add US Foods as a defendant until March of 2020. *See* Mot. to Amend, *Evers v.* Sodexo, No. 3:19-cv-01907 (S.D. Cal. Mar. 2, 2020), ECF No. 25.[37] Considering the evidence available, the Court finds that the statute of limitations does not bar Plaintiffs' claims against US Foods.

"In a federal diversity action brought under state law, the state statute of limitations controls." *Bancorp Leasing & Fin. Corp. v. Agusta Aviation Corp.*, 813 F.2d 272, 274 (9th Cir. 1987). "California has a two-year statute of limitations for most tort claims alleging personal injury, including product liability claims." *Rustico v. Intuitive Surgical, Inc.*, 993 F.3d 1085, 1091 (9th Cir. 2021) (citing Cal. Civ. Proc. Code § 335.1). However, under California's statutorily codified delayed discovery rule for toxic exposure cases:

> In any civil action for injury or illness based upon exposure to a
> hazardous   material   or   toxic   substance,   the   time   for

---

[37]      All Plaintiffs moved to amend their operative complaints to add US Foods as a defendant except lead Plaintiff Grano.

commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later.

Cal. Civ. Proc. Code § 340.8.[38]

In its Motion for Summary Judgment, US Foods argues Plaintiffs were aware that beef may have been the source of their illness by November 1, 2017, because all Plaintiffs were hospitalized by then with discharge paperwork referencing an "outbreak." ECF No. 340 at 16-17. However, US Foods conflates Plaintiffs' knowledge of their injury (i.e., an "outbreak") with their awareness of the cause of that injury. California's delayed discovery rule for toxic exposure cases tolls accrual of a cause of action until a plaintiff becomes aware of, or reasonably should have become aware of, "(1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another . . . ." Cal. Civ. Proc. Code § 340.8. While Plaintiffs may have learned at the hospital that they were infected with STEC, there is no evidence in the record demonstrating that Plaintiffs knew the cause of their STEC or were aware of sufficient facts that the STEC was caused or contributed to by the wrongful act of another. *See Juarez v. Precision Valve & Automation, Inc.*, No. 2:17-cv-03342, 2018 WL 6834296, at *4 (C.D. Cal. Dec. 27, 2018) ("Although the identity of a defendant 'is not an essential element of a products liability cause of action . . . a

---

[38]   "Media reports regarding the hazardous material or toxic substance contamination do not, in and of themselves, constitute sufficient facts to put a reasonable person on inquiry notice that the injury or death was caused or contributed to by the wrongful act of another." Cal. Civ. Proc. Code § 340.8.

plaintiff's ignorance of wrongdoing involving a product's defect will usually delay accrual because such wrongdoing is essential to that cause of action.'" (quoting *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 813 (Cal. 2005))).

Additionally, US Foods argues that the CDC's investigation from November through December 2017 put Plaintiffs on notice that food was a potential cause of the outbreak. ECF No. 340 at 16-17. However, US Foods fails to acknowledge that the purpose of the CDC's investigation was to determine the source of the outbreak because it was unknown. "Summary judgment is not warranted 'when the facts are susceptible of more than one reasonable inference, or the undisputed facts do not support a finding . . . that a reasonable person would suspect that an injury was wrongfully caused.'" *Juarez*, 2018 WL 6834296, at *4 (quoting *Rosas v. BASF Corp.*, 236 Cal. App. 4th 1378, 1392 (Cal. Ct. App. 2015)). Here, the CDC contemplated a variety of possible sources for the outbreak, including hygiene and environmental factors. Accordingly, the CDC's investigation put Plaintiffs on inquiry notice that beef was the potential cause of the outbreak no more than hygiene or any other environmental factor. Therefore, the facts in the record are susceptible to more than one reasonable inference, including that Plaintiffs did not suspect any defective product was responsible for their STEC until after learning of the CDC's findings through the publication of the Healio article on April 28, 2018.

Alternatively, US Foods argues that Plaintiffs could have become aware of the cause of their injuries through reasonable investigation. "When a plaintiff reasonably should have discovered facts for purposes of the accrual of a ca[u]se of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence . . . can support only one reasonable conclusion." *Rosas*, 236 Cal. App. 4th at 1394 (quoting *Alexander v. Exxon Mobil*, 219 Cal. App. 4th 1236, 1252 (Cal. Ct. App. 2013)). Here, US Foods argues that Plaintiffs could have become aware of the cause of their injuries through their own investigation. Yet, the CDC — the Nation's premier agency on epidemiology — was unable to definitively determine the cause of the outbreak.

Accordingly, the Court finds that US Foods' expectation that Plaintiffs could have become aware of the cause of their injuries through investigation is unreasonable.

### 2.    Plaintiffs' Negligence Claim

Although US Foods moved for summary judgment on Plaintiffs' negligence claim, "Plaintiffs agree that no evidence of negligence has been generated against US Foods . . . ." ECF No. 353 at 17. Therefore, the Court grants in part US Foods' Motion for Summary Judgment and dismisses Plaintiffs' negligence claim as to US Foods.[39]

### 3.    Causation

Relying primarily on Defendants' *Daubert* motions and motions in limine, US Foods moves for summary judgment on Plaintiffs' strict liability claim because Plaintiffs have not advanced admissible evidence of expert opinion regarding causation. ECF No. 340 at 25-27. The Court has largely denied Defendants' *Daubert* motions and motions in limine in this Order. *Supra* pp. 34-47. Based on the evidence and expert testimony Plaintiffs proffered, the Court finds that a genuine issue of material fact still exists as to causation.

### 4.    Sodexo's Indemnity Claims

US Foods argues it is entitled to summary judgment on Sodexo's third-party claims because Sodexo cannot prove a claim for equitable indemnity without Plaintiffs' first establishing liability against Sodexo. ECF No. 340 at 29. Sodexo responds that summary judgment is inappropriate because Sodexo's claim of equitable indemnity is independent of Plaintiffs' claims and has not yet accrued. ECF No. 369 at 47. Both Parties are correct as to the current status of Sodexo's third-party claims, but neither is correct as to the resulting outcome on summary judgment.

---

[39]    Sodexo clarifies that its Third-Party Complaint against US Foods [ECF No. 128] is based on Plaintiffs' strict liability claim — not Plaintiffs' negligence claim. ECF No. 369 at 5. Thus, the Court denies as moot US Foods' Motion to the extent that it seeks summary judgment on Sodexo's third-party equitable indemnity claims premised on Plaintiffs' negligence claims.

Under California law, an "equitable indemnity action is separate and distinct from the plaintiff's tort action. The indemnity action, unlike the plaintiff's claim, does not accrue . . . when the original accident occurs, but instead accrues at the time the tort defendant pays a judgment or settlement as to which he is entitled to indemnity." *Valley Circle Ests. v. VTN Consol., Inc.*, 33 Cal. 3d 604, 611 (Cal. 1983) (quoting *People ex rel. Dep't of Transp. v. Super. Ct.*, 26 Cal. 3d 744, 748 (Cal. 1980)). Sodexo has not been found liable for Plaintiffs' injuries. Plaintiffs' claims against Sodexo have not even been adjudicated yet. As such, Sodexo has not yet accrued any equitable indemnity claims. Therefore, the Court denies as moot US Foods' Motion for Summary Judgment as to Sodexo's third-party claims.

However, the Court also finds that Sodexo's Third-Party Complaint is premature. Under the ripeness doctrine, a claim is not ripe for adjudication where matters are "premature for judicial review because the injury at issue is speculative, or may never occur." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 838 (9th Cir. 2014). Given that Sodexo's third-party claims have not accrued, the Court lacks subject matter jurisdiction over the third-party claims because they are not ripe. *See Alpine Vista II Homeowners Ass'n v. Pan*, No. 3:15-cv-00549, 2018 WL 6701275, at *8 (D. Nev. Dec. 20, 2018) (finding no subject matter jurisdiction over a third-party cross claim for equitable indemnification because the claims were unripe). Although the Court has the authority to dismiss Sodexo's third-party claims for lack of subject matter jurisdiction now, the Court will provide Sodexo, US Foods, and Plaintiffs the opportunity to brief this issue prior to dismissal. *See, e.g.*, *Scholastic Ent., Inc. v. Fox Ent. Grp., Inc.*, 336 F.3d 982, 985 (9th Cir. 2003) ("While a party is entitled to notice and an opportunity to respond when a court contemplates dismissing a claim on the merits, it is not so when the dismissal is for lack of subject matter jurisdiction." (citations omitted)); *Kamaole Pointe Dev. LP v. Cnty. of Maui*, No. 07-cv-00447, 2008 WL 5025004, at *3, *8 (D. Haw. Nov. 25, 2008) (dismissing unripe claims at the summary judgment stage, as if raised in a motion to dismiss under Rule 12(b)(1)). Accordingly, the Court directs Sodexo, US Foods, and Plaintiffs to each file one

supplemental brief within 14 days of the entry of this Order.[40] The supplemental briefs may be no more than five pages and only address whether Sodexo's third-party claims should be dismissed as unripe.

## VI.    CONCLUSIONS & ORDERS

For the reasons above, the Court:

1.    **DENIES** Defendants' Motion to Exclude the CDC's Epi-Aid Team Report, Case Control Study, and references to 9 C.F.R. § 417.3(b), ECF No. 337.

2.    **DENIES AS MOOT** Defendants' Motion in Limine to exclude the declaration of Dr. Amelia Keaton, ECF No. 379.

3.    **GRANTS IN PART** Defendants' Motion to Exclude [ECF No. 338] by precluding Dr. Kirk Smith from testifying that ground beef patties were the cause of the recruit outbreak, and **DENIES IN PART** Defendants' Motion as to the remainder of Dr. Smith's testimony **WITHOUT PREJUDICE** to renewal at the time of trial.

4.    **DENIES** Defendants' Motion to Exclude Scott Stillwell, Ph.D., ECF No. 339.

5.    **DENIES** Defendants' Motion to Exclude Dr. Michael Mont, ECF No. 346.

6.    **DENIES WITHOUT PREJUDICE** Defendants' Motion to Exclude Dr. Roberto Civitelli **AS MOOT**, ECF No. 346.

7.    **DENIES** Defendants' Motion for Summary Judgment on Plaintiffs' Claims, ECF No. 341.

8.    **DENIES** Cargill's Motion for Partial Summary Judgment Regarding Punitive Damages, ECF No. 343.

9.    **DENIES AS MOOT** Cargill's Motion for Summary Judgment on Sodexo's cross claims, ECF No. 342.

10.    **GRANTS IN PART** US Foods' Motion for Summary Judgment [ECF No. 340] and **DISMISSES** Plaintiffs' negligence claim against US Foods, **DENIES AS**

---

[40]    Plaintiffs may file only one collective supplemental brief.

**MOOT** the Motion for Summary Judgment as to Sodexo's third-party equitable indemnity claims, and **DENIES** the Motion for Summary Judgment as to all remaining requested relief.

11.     **DIRECTS** Sodexo, Plaintiffs, and US Foods to each file within 14 days of the entry of this Order one supplemental brief of no more than five pages addressing whether Sodexo's third-party claims should be dismissed as unripe.

12.     **DENIES** all other requested relief that this Order does not address.

**SO ORDERED**.

Dated: January 6, 2023

Hon. Robert S. Huie
United States District Judge

3:18-cv-1818-RSH-BLM